NEDTWEG *v.* WALLACE.

1. NAVIGABLE WATERS—STATUTE AUTHORIZING LEASING OF LAKE
BOTTOM LAND VALID.

Act No. 326, Pub. Acts 1913 (1 Comp. Laws 1915, § 606
*et seq.*), providing that all unpatented overflowed lands,
made lands, and lake bottom lands belonging to the State
of Michigan or held in trust by it, shall be held, leased,
and controlled by the State board of control (now State
commission of conservation) is a valid exercise of legis-
lative power.

2. MANDAMUS—WILL ISSUE TO COMPEL LEASING OF LAKE BOTTOM
LANDS.

Under Act No. 326, Pub. Acts 1913 (1 Comp. Laws 1915,
§ 606 *et seq.*), when an applicant applies to the State com-
mission of conservation for a lease of relicted land to
which the provisions of said statute apply, it is the duty
of the commission to execute it, and, on its refusal, man-

[1]Navigable Waters, 29 Cyc. p. 358; [2]Mandamus, 38 C. J. § 231.

damus will issue, if necessary, to compel compliance with
the act.

McDONALD, J., dissenting.

ON REHEARING.

3. NAVIGABLE WATERS—LAKE BOTTOM LANDS UNFITTED FOR NAVI-
GATION, HUNTING OR FISHING MAY BE LEASED BY STATE.

Beds of the Great Lakes, involving no riparian or littoral
rights, unfitted for navigation, hunting, or fishing by
permanent recession of waters, reliction, accretion or al-
luvion, and useful for residence purposes with or without
shoring or dredging, may be leased by the State in its
proprietary capacity under legislative authorization.
SNOW and McDONALD, JJ., dissenting.

Mandamus by George Nedtweg to compel W. W.
Wallace and others, State commission of conservation,
to execute a lease under the provisions of Act No. 326,
Pub. Acts 1913.     Submitted October 27, 1925.     (Cal-
endar No. 32,263.)     Writ granted March 20, 1926.
Resubmitted June 30, 1926.     Former opinion affirmed
January 3, 1927.

*H. E. Spalding,* for plaintiff.

*Andrew B. Dougherty,* Attorney General, *Clare
Retan,* Deputy Attorney General, *Henry S. Sweeny* and
*Sheridan F. Master,* Assistants Attorney General, for
defendants.

WIEST, J.     Reliction has rendered several thousand
acres of the bed of Lake St. Clair suitable for cottages
and summer homes.     The State caused a survey to
be made, set aside a part of such former lake bed for
a park, divided the rest into lots and, by legislation,
authorized leases of lots to private persons for long
terms.     About 2,000 persons are interested in lease-
holdings covering over 3,000 acres of such land, and
many cottages and summer homes have been built and

---

[3]Navigable Waters, 29 Cyc. p. 349.

taxes assessed and collected.   Plaintiff applied to the State commission of conservation for a lease of one of the lots and was refused on the ground that the legislative act authorizing leases is unconstitutional, because title to the bed of the lake is in the State in trust for the benefit of all the people and, therefore, no part thereof may be set over by lease to any person. We are asked to direct the commission, by our writ of mandamus, to grant the lease.   The issue involves the nature of the title in the State and the power of the legislature in the premises.

The State of Michigan, upon admission to the Union, became vested with title to the beds of all the navigable waters, like unto the crown of England, or the crown and parliament at common law.   This State is committed to the common-law doctrine that riparian rights extend to the thread of rivers and into lakes, except the Great Lakes.   It is necessary to go back to the common law to decide the claim that the title of the State is impressed with a perpetual trust under which rights of navigation, fishing and fowling must be saved to the public.   Except as to navigation there has been no grant of power over the beds of the Great Lakes to the Federal government.   The Constitution of this State contains no limitation upon legislative power with reference to the beds of navigable waters. What is this trust so often mentioned in the books, frequently cited in legislation and recognized by our legislature, by reference, in acts relative to such beds? And how has it happened that in this State, contrary to the rule in some others, title to the beds of inland lakes and rivers and the beds of the three rivers connecting the Great Lakes has not been retained by the State?   Much is answered by recognition of the distinction between the proprietary title and obligations of sovereignty.   The beds of navigable waters, like any other part of the public domain, may pass, by grant, or the common-law rule of riparian ownership,

to individuals, but the sovereign power retains, because inalienable, all public rights of navigation therein or thereover.    There has arisen, out of centuries of effort, limitation of crown prerogative, parliamentary action, numerous adjudications, common necessity, and public forethought, a rule beyond question, impressing rights of the public upon all navigable waters.

The trust is a common-law one; it prevailed in England long before the American Revolution; it was in the Virginia cession of the territory northwest of the River Ohio; it continued during the period the United States held the Northwest Territory and passed as the same trust to the State of Michigan at her admission to the Union; it has not changed in character or purpose and is an inalienable obligation of sovereignty.    But at common law the crown and parliament recognized the distinction between the governmental power essential to be retained to carry out the trust and the mere proprietary interest possible of being parted with, without at all preventing governmental control.    The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government.    But this does not mean that the State must, at all times, remain the proprietor of, as well as the sovereign over, the soil underlying navigable waters.    If this were the rule then there could exist no riparian rights in this State in navigable rivers. The rule is that the State may grant the *jus privatum* but never alienate the *jus publicum*.    The State of Michigan has an undoubted right to make use of its proprietary ownership of the land in question, by lease to private persons and need only hold sovereignty over its use to the end that the public shall enjoy the benefit of the trust.

Act No. 326, Pub. Acts 1913 (1 Comp. Laws 1915, § 606 *et seq.*), provides:

237—Mich.—2.

"All of the unpatented overflowed lands, made lands and lake bottom lands belonging to the State of Michigan or held in trust by it, shall be held, leased and controlled by the State board of control," etc. (now State commission of conservation).

Under the act such land may be leased for 99 years, except as set aside for public parks, but may not be sold and at all times is subjected to the rights of navigation, hunting and fishing.   We note the broad language employed in designating the lands to be leased and the contention of the attorney general that: "The legislature may not authorize a grant for private purposes of all the beds of all the Great Lakes, lands held in trust by the State."   So far as the issue here is concerned, we entertain the opinion that "lake bottom lands" means lands not wholly subaqueous, but relicted lands and actually surveyed as such by the State in accordance with the provisions of the act.

The issue here presents nothing new.   The question, in all of its ramifications, has been considered in numerous cases and there is no difficulty in coming to decision if the common law is fully comprehended and given application.   A few extracts from 1 Farnham on Waters and Water Rights, § 36, p. 169, will elucidate the question at bar far better than any attempt to gather guidance from the efforts at application of the common law evidenced in conflicting adjudications.

"After it had become thoroughly established that the crown could grant its rights in the tide waters only subject to the rights of the public, statutes were passed which prevented his making any grant except upon conditions imposed by parliament.   And finally the crown was required, as part of the coronation procedure, to make a general grant of the waste lands belonging to it to the public, to be administered for the public good.   So that, as the law became finally settled in England, the crown, until deprived of that power by statute, might grant the land under any of

the waters of the kingdom, subject only to the public rights therein, which, so far as developed, were only those of navigation and fishery. Even now, with the consent of parliament, the land under the water may be granted for the purpose of reclamation, so far at least as such use of it will be more advantageous than the public right of navigation and fishery. * * * Whether the title is in the crown or in a private individual, it is subject to the public use, to the injury of which the private title can never be used."

At early common law title to the beds of navigable waters was in the crown with prerogative of alienation subject, however, to rights of navigation. The crown so repeatedly exercised the prerogative that little, if any, of such beds remained undisposed of and there came a long period of questioning such grants and also riparian proprietorship. The attorney generals of England were active, but quite unsuccessful, in their efforts to obtain for the crown something the crown could dispose of. Such efforts were at high tide when Charles I. lost his crown, were quiescent during the period of the commonwealth and renewed under Charles II. and his successors, until a quietus was given thereto by a procedure of the coronation divesting the crown of such sole power and resulting, before the American Revolution, in vesting the power in parliament and the crown. So, when the United States acquired title to the beds of navigable waters, such title was vested in the States subsequently admitted, on like footing with the original States, with power of alienation to the extent formerly exercised by the English crown and parliament subject, of course, to rights of navigation and incidents of public use. The legislature of this State has all the power of the parliament of England at the time of American separation, except as delegated to the Federal government or limited by the Constitution of the State. There is analogy between rights of riparian proprietors in navigable rivers and rights of lessees to

relicted lake bed under the provisions of the act. The riparian proprietor has private rights to the thread of the river but such rights are subordinate, at all times, to the public rights of navigation and other rights inherent in the people. There is a trust reposed in the sovereignty of the State to safeguard and preserve such public rights. The lessees, under this act, acquire proprietary rights, but at all times such rights are subordinate to the rights of the public to the same extent and on the same principle as are the rights of riparian proprietors.

The provision in the Ordinance of 1787 that:

"The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other States that may be admitted into the confederacy, without any tax, imposts, or duty therefor" (1 Comp. Laws 1915, p. 103),

was declaratory of the common law and the ordinance accomplished no more than to preserve the rivers and lakes as common highways and in no sense prevents the State from granting the soil under navigable waters to private owners. *Sewers* v. *Hacklander*, 219 Mich. 143. The State is sovereign of the navigable waters within its boundaries, bound, however, in trust, to do nothing in hindrance of the public right of navigation, hunting and fishing. The State may separate the *jus privatum* from the *jus publicum* by sale of the former, but can never, by sale or otherwise, grant away the *jus publicum*.

As stated in 3 Kent Com. (14th Ed.), 427:

"The public have at common law a right to navigate over every part of a common navigable river, and on the large lakes; and in England even the crown has no right to interfere with the channels of public navigable rivers. They are public highways at common

law. The sovereign is trustee for the public, and the use of navigable waters is inalienable. But the shores of navigable waters, and the soil under them, belong to *the State* in which they are situated, as sovereign."

See, also, *Pollard's Lessee* v. *Hagan,* 3 How. (U. S.) 212.

The rights of the public, of which the State, in its sovereign governmental capacity, acts as trustee, have been sedulously protected; not in prohibiting grants by the State of private rights to relicted lake beds or the rule of riparian ownership, for such would restrict the proprietary sovereignty, but in denying the power, by grant or otherwise, to abdicate the trust by placing use and control in private hands to the curtailment or exclusion of public use. The governing rule is pointed out in *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387 (13 Sup. Ct. 110) ; *People* v. *Kirk,* 162 Ill. 138 (45 N. E. 830, 53 Am. St. Rep. 277) ; *Saunders* v. *Railroad Co.,* 144 N. Y. 75 (38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729).

*Shively* v. *Bowlby,* 152 U. S. 1, 26 (14 Sup. Ct. 548), involved title to lands below high water mark in the city of Astoria, in the State of Oregon, under an act of the legislature providing for the sale of tide and overflowed lands on the seashore and coast. The court, after reviewing early decisions, stated:

"The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public."

*Saunders* v. *Railroad Co., supra,* involved a State grant of land under the waters of the Hudson river. It was said:

"The main assault is based upon the proposition that the State had the title to this land, not as proprietor, but as sovereign and trustee for the public. The contention as to the nature of the title cannot be denied, but the conclusion sought to be drawn from the fact does not follow. The question was decided in this court in *Langdon* v. *Mayor, etc., of New York,* 93 N. Y. 129, and *Mayor, etc., of New York* v. *Hart,* 95 N. Y. 443, and has recently been examined with great learning by the Supreme Court of the United States in the case of *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387 (13 Sup. Ct. 110). * * *

"While the State holds the title to lands under navigable waters in a certain sense as trustee for the public, it is competent for the supreme legislative power to authorize and regulate grants of the same for public, or such other purposes as it may deem to be for the best interests of the State, and the legislature has conferred power upon the commissioners of the land office to make such grants for railroad purposes."

*Port of Seattle* v. *Railroad Co.,* 255 U. S. 56 (41 Sup. Ct. 237), involved tide lands, filled, platted as city blocks and laid out with streets and the sale of lands therein for business and other purposes. It was said:

"The right of the United States in the navigable waters within the several States is limited to the control thereof for the purposes of navigation. Subject to that right Washington became, upon its organization as a State, the owner of the navigable waters within its boundaries and of the land under the same. * * * The character of the State's ownership in the land and in the waters is the full proprietary right."

Who is to determine whether the *jus privatum* can be let and used without impairment of the *jus publicum?* It surely is subject to determination, else the lake beds must forever retain their original character, even though, by reliction, they become dry land or otherwise unfitted to serve the purposes of navigation, fishing or fowling. The legislature is vested

with power to determine whether the public interests will be best served by leaving lake bottom, unsuited to purposes of navigation, in a wild state and wholly unproductive of any public revenue or of benefit, except to hunters, or permit use thereof, under suitable regulations, to the greater benefit of the public. The legislative act retains in the State every feature of the trust reposed in its governmental capacity and all use authorized thereunder will have to give way to the rights of the public. Is it a breach of the trust to permit cottages to be built where lake bed is made habitable by reliction or in places that may be rendered such by shoring? We think not. Wild fowl will undoubtedly depart from the district occupied by cottages, but must the legislature leave the fowl to be molested by none but the fowler? We think not.

We find nothing in this record warranting us in declaring the act of the legislature void. Plaintiff is entitled to the lease he applied for, and the commission is directed to obey the provisions of the legislative act. We confine our decision to the law and leave, as we must, the grave question of public policy to the legislative power.

The writ of mandamus will issue if necessary. Plaintiff will recover costs.

BIRD, C. J., and STEERE, J., concurred with WIEST, J.

SHARPE, J. It is conceded that the title to the lands known as the St. Clair Flats rests in the State. The nature of this title was settled in *State* v. *Venice of America Land Co.,* 160 Mich. 680, 701. It was there said:

"The depth of water upon submerged land is not important in determining the ownership. The condition of this territory when the State was admitted into the Union is the condition which must control. That the State of Michigan holds these lands in trust

for the use and benefit of its people—if we are correct in our conclusion—cannot be doubted. The State holds the title in trust for the people, for the purposes of navigation, fishing, etc. It holds the title in its sovereign capacity. *People* v. *Silberwood*, 110 Mich. 103 (32 L. R. A. 694); *State* v. *Fishing & Shooting Club*, 127 Mich. 580."

Prior to any of these decisions, the Supreme Court of the United States, in *Illinois Cent. R. Co.* v. *Illinois*, 146 U. S. 387 (13 Sup. Ct. 110), decided in 1892, in an exhaustive opinion written by Mr. Justice Field, defined with much particularity the title which a State holds in the lands under the navigable waters of the Great Lakes. (For convenience, as the opinion is lengthy, I refer to the pages on which the language quoted appears. The italics in all cases are mine.) He first very clearly states the doctrine that the ownership of and dominion and sovereignty over lands covered by tide waters rests in the respective States bordering on them, and then applies the same doctrine to the navigable waters of the Great Lakes. He then says that the title thus acquired (page 452) "necessarily carries with it control over the waters above them whenever the lands are subjected to use." He then discusses at length the nature of the State's title:

"But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the State may grant parcels of the submerged lands; and, so long as their disposition is made for such purpose, no valid objections can be made to the

grants. It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, *and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining,* that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State."

It is thus clearly stated that grants may not only be made of such lands for the improvement of navigation and commerce, but that such lands may also be disposed of by the State, "which, being occupied, do not substantially impair the public interest in the lands and waters remaining." That the language so used was not merely an incidental utterance will be seen from its repetition, in effect, in that which follows whenever the right of the State to dispose of such lands is mentioned. After defining particularly the nature of the trust under which the State holds, he says, on page 453:

"The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, *or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.* It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, *or which when occupied do not substantially impair the public interest in the lands and waters remaining,* and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. * * * The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, *or when parcels can be disposed of without impairment of the public interest in what remains,* than it

can abdicate its police powers in the administration of government and the preservation of the peace."

And again on page 455:

"The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances mentioned of parcels used ·in the improvement of the interest thus held, *or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining.*"

Other extracts from this opinion, in which substantially similar language is used, were quoted[1] in *People* v. *Silberwood,* 110 Mich. 103, 107, following which this court said:

"It seems to me the reasoning of this case is without flaw, and that the law enunciated therein ought to stand as the law of this State.     It commends itself to one's reason and judgment, and avoids many difficulties incident to a different construction of the law."

In a later case (*Shively* v. *Bowlby,* 152 U. S. 1, 46 [14 Sup. Ct. 548]), when referring to the holding in the Illinois case, it was said:

"In the yet more recent case of *Illinois Cent. R. Co.* v. *Illinois* (1892), which also arose in Illinois, it was recognized as the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, or navigable lakes, within the limits of the several States, belong to the respective States within which they are found, *with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in such waters,* and subject to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce.     146 U. S. 387, 435-437, 465, 474."

The adjudged cases which Mr. Justice Field says "can be reconciled" only by holding that the State has the right to grant parcels "for the improvement of the public interest, or which when occupied do not

substantially impair the public interest in the lands and waters remaining" will be found in the dissenting opinion of Mr. Justice Shiras, beginning on page 465, and in the briefs of counsel appearing in the report (pages 414 to 432).

That a different rule did at that time prevail in some of the States is well illustrated by the decision in *People* v. *Ferry Co.,* 68 N. Y. 71. In that case the rules of the common law applicable to the soil under tide waters were discussed at length, and it was pointed out that while the sovereign could make no grant in derogation of the common right of passage over navigable waters, parliament could do so, and it was said that "the public right in navigable waters was in no way affected or impaired by the change of title" from the king to the States, and that the people in their sovereign capacity succeeded to the royal title and might exercise the same powers which previous to the separation might have been exercised by the king alone, or by him in conjunction with parliament. It was then said:

"The State, in place of the crown, holds the title, as trustee of a public trust, but the legislature may, as the representative of the people, grant the soil, or confer an exclusive privilege in tide-waters, or authorize a use inconsistent with the public right, subject to the paramount control of congress, through laws passed, in pursuance of the power to regulate commerce, given by the Federal Constitution."

The doctrine thus announced was followed in *Langdon* v. *Mayor, etc., of New York,* 93 N. Y. 129. I quote from the syllabus:

"The State, as successor to all the rights of both the crown and parliament of England in the navigable waters within its limits, and in the soil under them, holds them as absolute owner, and subject to constitutional limitations has an absolute and uncontrollable power to grant them."

The holding in this class of cases seems to be founded upon the right of the legislature of the State as the representative of the public to abrogate the trust under which the title is held. That this doctrine was not in harmony with the decisions of the Supreme Court of the United States theretofore rendered clearly appears from the decision in *Weber* v. *Harbor Commissioners,* 18 Wall. (U. S.) 57. In that case it appeared that the legislature of California had passed an act granting to the city of San Francisco for a term of 99 years the use and occupation of portions of the lands covered by the tide waters of the bay in front of the city for a permanent water front. It reserved to the State the right to regulate the construction of wharves and other improvements. The plaintiff acquired the title of the city. It was held that a particular wharf erected by plaintiff was an encroachment upon the soil of the State which it could remove at pleasure, and that the State, irrespective of the grant, could authorize improvements in the harbor, by the construction of which the use of the wharf would necessarily be destroyed.

Between the claim on the one side that the State may part with its title at will and that on the other that it may not part with its title at all except in aid of navigation, or for a public purpose, Mr. Justice Field announced the true doctrine to be that the State might dispose of parcels of such lands when it could be done "without detriment to the public interest in the lands and waters remaining." This appeals to me as sound and reasonable, and I think it should be adopted as the law of this State.

Let us apply it to the facts in this case. The lands in question, known as the St. Clair Flats, must be treated as submerged land (*State* v. *Venice of America Land Co., supra*) to which the trust doctrine as to the State's title is applicable. By reason of the

lowering of the waters in the lake, or other causes not necessary to consider, certain of these lands have become relicted, that is, uncovered by the recession of the water. The record of the Davis survey shows that the lot in question was at that time nearly all upland. We may take judicial notice of the lowering of the water in the lake since that survey was completed in 1902. The lot is now undoubtedly all relicted land. The petition herein alleges that this lot and other lands included in the Davis survey "are now unfit for hunting or fishing and incapable of use for navigation." The truth of this allegation is admitted in the answer of the defendants. If this land may be occupied without any substantial impairment of the rights reserved to the public under the trust with which the State's title is burdened, no public purpose will be served by holding that the State may not permit it to be occupied. The wisdom of doing so is a matter for the consideration of the legislature, not the courts.

To adopt the strict rule that the legislature has no power to dispose of lake bottom lands for any except a purpose consistent with the terms of the trust might lead to unfortunate results. If the owner of land bordering on the lake should develop a coal or iron mine thereon and it be found that the vein extended under the waters of the lake, it would be a misfortune, indeed, if the legislature might not permit the coal or iron ore to be removed on terms which were reasonable and just, providing such removal would in no way interfere with navigation.

In my opinion, the Supreme Court of the United States in its later opinions has not deviated from the rule announced in the Illinois case. The decisions relied on to establish a different rule are in cases involving riparian rights, and as to those, except such as involve accretions, it is said that they "are governed

by the laws of the several States, subject to the rights granted to the United States by the Constitution." *Shively* v. *Bowlby, supra.*

In *Port of Seattle* v. *Railroad Co.,* 255 U. S. 56 (41 Sup. Ct. 237), it appeared that under appropriate State legislation extensive tide lands fronting on the city had been developed as a port. These improvements were for the benefit of navigation and well within the power of the State. The issues in that case involved rights in the lands adjoining the shore which had been filled in under legislative authority. The defendant claimed a riparian right to construct wharves and docks from the land owned by it to obtain access to a waterway. The nature of the State's title, although said to be "the full proprietary right," was not questioned, both parties claiming under grants from it.

My attention is called to the recent decision in *United States* v. *Holt State Bank,* U. S. Adv. Ops. 1925-26, p. 212 (46 Sup. Ct. 197), in which it is said "that lands underlying navigable waters *within a State* belong to the State in its sovereign capacity." It is sufficient here to say that the nature of the State's title to such lands "within a State" is not here presented.

But, whatever may be the rule in other States, it is settled beyond question in this State, unless a number of well-considered decisions be overruled, that the State holds its title to the lands in the beds of the Great Lakes "in trust for the people, for the purposes of navigation, fishing, etc." *State* v. *Venice of America Land Co., supra.*

It follows from what has been said that the legislature had the power to confer upon the commission the authority to lease such of these lands as had become relicted, and to that extent the validity of the act is sustained. As the lot in question is within this class,

the writ of mandamus will issue, if necessary.    No costs will be allowed.

CLARK, J., concurred with SHARPE, J.

McDONALD, J. (*dissenting*).    I cannot agree in up-holding the validity of a statute (Act No. 326, Pub. Acts 1913), which provides for the leasing of all of the overflowed lands and lake bottom lands in the State of Michigan, to private parties for private purposes. These lands are not alienable or at most are only con-ditionally so.    They are held in trust by the State in its sovereign capacity for the use of all of the people for the purpose of navigation, hunting and fish-ing.    *State* v. *Venice of America Land Co.*, 160 Mich. 680.    The State cannot abdicate its trust.    It may make a grant of parcels of such lands for the public benefit or for any purpose that will be of greater benefit to the people than their rights of navigation, hunting or fishing.    But it cannot, consistently with its trust, make a grant of any portion of such lands to any person for private use.    The State is charged with the protection of public rights in public waters and public lands, and any grant to private parties for private use is in derogation of those rights.    The rights which the people have in the waters and the beds of the Great Lakes are common to all of them. They are equal and correlative, and so, when the State undertakes to grant special privileges to Paul it must take corresponding privileges away from Peter.    This cannot be done without a violation of its trust.    It cannot give any of the public rights for private use. Legally no individual can be given any greater rights than he enjoys as a member of the public.    If he is given any privilege above that which other people have, it is to that extent an infringement of their rights.    It is difficult to conceive of any circumstances under which it would be possible to make a grant of

public lands for private use without an impairment of public rights. If we are to maintain the trust theory as to these lands and waters in this State, we must hold that grants for private use are absolutely void. The validity of the statute in question cannot be sustained.

It authorizes leases of all the unpatented overflowed lands, made lands and lake bottom lands in the State of Michigan to private parties for private use for 99 years with the privilege of renewal. It gives exclusive possession and control of the land leased to the lessees by permitting them to build cottages and club houses, to dredge, to ditch, throw up embankments, put in sheet piling, and fence in the property. The idea of building fences is, of course, to exclude the public, whose right to free access the State is charged with protecting. Every lease authorized by the statute destroys public rights in the lands and waters leased. Is Justice WIEST right in saying, "The legislative act retains in the State every feature of the trust reposed in its governmental capacity?" We think not. Another objectionable feature of the statute is that which authorizes leases for 99 years with the privilege of renewal and sale by the lessees. In its effect upon public rights a lease for such a term is equivalent to the alienation of the fee. This objection is rendered more serious because the statute also authorizes such long term leases of all of the unpatented overflowed lands and lake bottom lands belonging to the State of Michigan, or held in trust by it. The amount of land that any one individual may thus lease is not specified. The conservation commission is given no discretion in the matter. Every applicant for a lease is entitled to as much of these lands as he can afford to lease. He places his own limitation on the amount he shall receive. So that it is possible under authority of this statute for every

foot of the thousands of acres of unpatented overflowed lands and lake bottom lands in the State of Michigan to pass into the hands of a few people for their private use, to the utter exclusion of the public, whose rights therein the State must protect or violate its trust. It is beyond the power of the legislature to enact any such a statute.

Thus far we have been considering some of the general features of the act and its disastrous effect upon the rights of the people. It remains but to apply what has been said to the case at bar. Here the plaintiff is an applicant under this statute for a lease of a small parcel of land in the St. Clair flats. The St. Clair flats, it is conceded, are a part of the lake bottom or bed of Lake St. Clair. Prior to the enactment of the statute in question in 1913, they consisted for the most part of submerged lands in which there was a rank growth of aquatic plants. In *State* v. *Fishing & Shooting Club,* 127 Mich. 580, Justice HOOKER said:

"This region is celebrated as one of the most extensive breeding places for fish and wild fowl that the country affords, and has been the paradise of sportsmen since the first settlement of the region."

Three thousand acres in this region have been leased under authority of the statute. Cottages and club houses have been built, embankments thrown up, sheet piling put in and the water pushed back. The conservation commission has declined to make any further leases. The plaintiff wants this court to issue its writ of mandamus to compel the execution of a lease to him for a period of 99 years. It is clear that a lease under the circumstances stated would be a substantial impairment of the rights of the public. Every man, woman or child in the State of Michigan who can carry a gun or a fishing rod has a right to pursue wild fowl or fish all over the St. Clair flats, and no

237—Mich.—3.

act of the legislature can deprive them of these rights except for a corresponding benefit to the public.

The act of the legislature under which this lease is sought is an attempt to convert public property to private use. It takes away from the people lands and waters which the State holds in trust for the common benefit and gives them nothing in return. The legislature has no such power. It can only legislate for the public good. This act does not authorize a grant for any public purpose. And, as I have endeavored to show, unless it is for a public purpose or the use to be made of the land granted is for the public benefit, the grant is invalid.

My Brother SHARPE contends that the legislature can authorize a grant of a portion of such lands and waters to private parties for private use when it can be done "without detriment to the public interest in the land and waters remaining;" and in support of this contention he cites and relies on *Illinois Cent. R. Co.* v. *Illinois,* 146 U. S. 387 (13 Sup. Ct. 110).

The opinion of Mr. Justice Field in that case does not hold that grants can be made to private parties for private use. It does hold that such grants may be made to private persons for public use. In most every judicial opinion, however able and exhaustive it may be, there is usually some general language which to be correctly understood must be read with reference to the particular facts of the case under consideration. When so read, the opinion of Justice Field merely holds that a grant of a portion of these lands and waters to a private person or corporation is only valid if made for public use. He was considering the validity of a grant to the Illinois Central Railroad Company, a grant for public use, "in aid of commerce;" and he said:

"So long as their disposition is made for such purposes, no valid objections can be made to the grants."

But regardless of the holding in the *Illinois Central Railroad Case,* let us examine the rule which my Brother says should be adopted by this court, in its application to the interest which the people of this State have in these public lands and waters. The rule contended for is that the legislature can grant such lands and waters to private persons for private use when it can be done "without detriment to the public interests in the lands and waters remaining." Under this rule the power of the State to take away valuable rights from the people is made to depend upon the fact that it does not take all they have and what is taken does not injure them in the enjoyment of what they have left. It is as though a stick-up man went through your pockets and took your pocket book containing $500, but left your fountain pen. If you can be deprived of your $500 "without detriment" to you in the use of your fountain pen, it is a perfectly legitimate transaction. The legislature has no power to take from one citizen what rightfully belongs to him and give it to another. While it is true that the people hold their rights in land subject to the public welfare, and, if necessary for the common good, can be compelled to surrender them, it is not true that they can be required to yield them to private persons for private purposes.

"The legislature is to make laws for the public good and not for the benefit of individuals." Cooley's Constitutional Limitations (7th Ed.), 184.

Both of my Brethren who have written to sustain the validity of this statute say that the land which the plaintiff desires to lease for a period of 99 years is relicted land, and Justice SHARPE says that the statute is valid to the extent that it authorizes grants of relicted land.

The statute does not authorize grants of relicted land, and if it did there is nothing in the record in-

dicating that this is relicted land. The petition of the plaintiff for the writ of mandamus contains no such allegation. And neither of the parties have made any such claim in their briefs or in their oral arguments. They agree upon the issue as stated by the plaintiff in his brief, as follows:

"The sole question in this case is whether the nature of the State's title to the lake bed is such that the legislature cannot authorize the disposal of any part of it in private ownership, though such ownership being expressly subjected to the public rights of navigation, hunting and fishing."

Under these circumstances we are not warranted in holding that this is relicted land, and in disposing of the issue on that ground. For aught the record shows it may be entirely submerged by the waters of the lake. But, if it could be regarded as relicted land, the question arises, What right has the legislature to authorize its conveyance to private parties for private purposes to the exclusion of the public? The right of passage over it belongs to the people. The State still holds it in trust for any public use of which it is capable. I do not understand that the rights of navigation, hunting and fishing are the only rights which the people have in the waters and lands of the Great Lakes. It may be that they were the only rights exercised in the earlier days, but the conditions and circumstances of the people are constantly changing. So is the law. Nothing is static. The changed circumstances of the people have made these lands subservient to new public uses. The people need the relicted lands of the Great Lakes for parks and playgrounds and for access to the water for the purpose of fishing and bathing. If necessary for the protection of the people in the enjoyment of these new rights, it is the plain duty of the court to alter or modify the common-law rules in this State, to make them ap-

plicable to the changed conditions and present needs of the people.

Holding this view of the matter, I cannot agree with my Brother SHARPE that this statute is valid to the extent that it authorizes grants of relicted lands to private persons for private uses. Nor can I give my judicial assent to the views of Mr. Justice WIEST. In my judgment the statute is wholly invalid. The conservation commission was right in refusing to execute a lease with the plaintiff.

The writ should be denied, without costs.

FELLOWS, J., did not sit.

Justice MOORE took no part in this decision.

## ON REHEARING.

WIEST, J. In the former opinion we stated:

"Reliction has rendered several thousand acres of the bed of Lake St. Clair suitable for cottages and summer homes."

We did not employ the term reliction in the restricted sense of land uncovered by a recession of water, but in the broader sense of former lake bed unfitted by recession of water and accretion for purposes of navigation, hunting and·fishing, and thereby rendered suitable for human occupation. We supposed this was made clear in the course of the opinion, but evidently we have been misunderstood by counsel for defendants.

Beds of the Great Lakes, involving no riparian or littoral rights, unfitted for navigation, hunting or fishing by permanent recession of waters, reliction, accretion or alluvion, and useful for residence purposes with or without shoring or dredging, may be leased by the State in its proprietary capacity under legislative authorization.

We adhere to the conclusion heretofore announced.

SHARPE, C. J., and BIRD, STEERE, and CLARK, JJ., concurred with WIEST, J.

MCDONALD, J. (*dissenting*).    The arguments on the rehearing of this cause have strengthened my conviction that the statute in question is wholly invalid. I adhere in all respects to the views expressed in my former opinion.

The writ should be denied.

SNOW, J., concurred with MCDONALD, J.    FELLOWS, J., did not sit.