## HILT v. WEBER.

1. NAVIGABLE WATERS—MEANDER LINE NOT BOUNDARY.

   Meander line is not boundary in law.

2. SAME—FEDERAL LAW—PURCHASER TAKES TITLE TO WATER'S EDGE.

   Under Federal law, purchaser from government of public land on Great Lakes took title to water's edge.

3. SAME—STATE LAW PARAMOUNT AFTER TITLE VESTS IN PRIVATE PERSON.

   State law became paramount on title to land on Great Lakes after it vested in private person.

4. EMINENT DOMAIN—STATE MAY NOT TAKE PRIVATE PROPERTY WITHOUT COMPENSATION.

   State cannot constitutionally take away from private person vested title without compensation.

5. NAVIGABLE WATERS—STATE TOOK TITLE ONLY TO SUBMERGED LAND.

   On its admission to the Union, the State, as sovereign, took title only to such land on Great Lakes as was then submerged and was, in fact, lake bed.

6. SAME—STATE TOOK NO TITLE TO UPLAND.

   Except as to parcels covered by special grant, the State never has acquired title to land which, at time of its admission to Union, was upland and has continuously remained dry, even though, by reason of mistake of surveyor, there was such land between meander line and shore of Great Lakes when survey was made.

7. SAME—RIPARIAN RIGHTS.

   Interposition of fee title between upland and water destroys riparian rights, or rather transfers them to interposing owner.

8. SAME—BASIS OF RIPARIAN RIGHTS IS CONTACT WITH WATER.

   Basis of riparian doctrine, and indispensable requisite to it, is actual contact of land with water.

---

On the question as to whether or not meander line is boundary, see annotation in 42 L. R. A. 510.

On right to place bathhouse or similar structure on shore in front of riparian owner, see annotation in 24 A. L. R. 1273.

9. SAME—RIGHT TO ACQUISITIONS IS ONE OF RIPARIAN RIGHTS.

    Right to acquisitions to land, through accession or reliction, is one of riparian rights.

10. SAME—GREAT LAKES.

    Law of sea applies to Great Lakes.

11. COURTS—STARE DECISIS—WRONG DECISION SHOULD BE OVER-RULED.

    Because judicial decision may apply to past as well as future titles and conveyances, change in rule of property is to be avoided where fairly possible, but where decision, especially recent one, is clearly wrong, and continuing injustice results from it, duty of court to correct error is plain.

12. SAME—DECISION THAT TITLE TO SHORE LAND IS IN STATE OVER-RULED.

    Where recent decisions enumerated principles at variance with settled authority and operated to take title of private persons to shore land and transfer it to State without just compensation, doctrine of *stare decisis* must give way to duty to no longer perpetuate error and injustice.

13. SAME—LOSS TO STATE INSUFFICIENT REASON FOR SUSTAINING WRONG DECISION.

    There being no duty, power, or function of State which will justify it in taking private property without compensation, loss to State by overruling decision taking title to shore land from private persons and transferring it to State without compensation is insufficient reason for sustaining said decision.

14. SAME—EFFECT OF DECISION THAT TITLE TO SHORE LAND IS IN STATE—TRUSTS.

    Decision transferring legal title to shore land from private persons to State did not give State absolute title which it could sell and transfer, but title in trust, same as that applying to bed of Great Lakes, in its sovereign capacity, for preservation of public rights of navigation, fishing, and hunting.

15. NAVIGABLE WATERS—RIPARIAN RIGHTS DEFINED.

    Generally, riparian rights are: (1) Use of water for general purposes, as bathing, domestic uses, etc.; (2) to wharf out to navigability; (3) access to navigable waters; (4) right to accretions.

16. EMINENT DOMAIN—STATE TAKING RIPARIAN RIGHTS MUST COMPENSATE OWNER.

   Riparian rights are property, for taking or destruction of which by the State compensation must be made, unless the use has real and substantial relation to paramount trust purpose.

17. NAVIGABLE WATERS—STATE'S RIGHT TO USE LAKE BED.

   Right of State to use bed of lake, except for trust purposes, is subordinate to that of riparian owner.

18. SAME—RIPARIAN OWNER HAS EXCLUSIVE USE OF SHORE LAND ON GREAT LAKES.

   Riparian owner has exclusive use of bank and shore on Great Lakes, and may erect bathing houses and structures thereon for his business or pleasure.

19. SAME—COURTS—OVERRULING DECISION THAT OWNER OWNS ONLY TO MEANDER LINE.

   Decision that riparian owners along Great Lakes own only to meander line is overruled.

20. VENDOR AND PURCHASER—BOUNDARY—FRAUD—DAMAGES—MEANDER LINE.

   Under this decision holding that riparian owner owns land between meander line and water of Great Lakes, purchaser of Lake Michigan shore land suffered no damage from misrepresentation of seller's agent that stake 100 feet from water marked boundary rather than meander line which is 277 feet from water.

   WIEST, C. J., and McDONALD, J., dissenting.

Appeal from Oceana; Barton (Joseph), J. Submitted October 8, 1929. (Docket No. 24, Calendar No. 34,491.) Decided December 2, 1930.

Bill by John R. Hilt and another against Herman H. Weber and another to foreclose a land contract. Cross-bill by defendants for an accounting. From decree for defendants, plaintiffs appeal. Reversed.

*Penny & Worcester,* for plaintiffs.

*Hinds & Kelly,* for defendants.

*Wilber M. Brucker,* Attorney General, and *M. M. Larmonth,* Assistant Attorney General, and *W. L. Jenks, amici curiæ.*

FEAD, J. The bill was filed to foreclose a land contract. Defendants claimed fraud in the sale, and, on cross-bill, were awarded damages.

The property is located in Oceana county on the shore of Lake Michigan. The meander line is 277 feet from the water's edge, is on a ledge 44 feet above the present level of the lake, and is partly in the woods. A stake had been driven in the shore 100 feet from the water. Plaintiffs' agent represented to defendants that the stake marked the boundary. Defendants had damages for failure of title to the strip between the meander line and the stake, under the authority of *Kavanaugh* v. *Rabior,* 222 Mich. 68, and *Kavanaugh* v. *Baird,* 241 Mich. 240, which hold that the fee in all land between the meander line and the water is in the State in trust, subject to riparian rights of the upland owner.

While some of the disputed strip undoubtedly has been always upland since before admission of the State into the Union, and the rest has been made dry land partly by accession and partly by reliction, the whole will be referred to as relicted land, unless otherwise indicated, to obviate constant distinction, as the title would be the same whatever its character in these respects, under either the *Kavanaugh Cases* or the other authorities. Nor are we concerned with the specific cause of reliction or accession so it be gradual, imperceptible, and natural or general to the lake.

The elements of defendants' damages for fraud depend upon the respective rights of the State and the riparian owner in the strip of relicted land. In

investigating them for the purpose of an enumeration of the respective rights, we found a conflict of authority which led to inquiry into other phases of the *Kavanaugh Cases.* Those phases did not arise in *Bankers Trust Co.* v. *Weber,* 244 Mich. 697; *Newman* v. *Bump,* 245 Mich. 665; and *Staub* v. *Tripp,* 248 Mich. 45 (in the latter of which a rehearing has been ordered), which followed the *Kavanaugh* decisions, but merely as precedents and without consideration of their soundness. Because of the conflict of authority, and also because the executive and legislative branches of the State government have felt need of more precise statement of the legal situation as a basis of legislation, we finally determined upon a frank re-examination of the *Kavanaugh Cases* from the viewpoint that, if they are right, they should be clarified by identifying the rights of the parties more minutely, and, if they are wrong, they should be overruled as effecting a virtual appropriation of private property to the State without compensation. In the re-examination we have had the assistance of briefs of counsel for the parties and also of the attorney general and others representing public and private interests as *amici curiæ.* In quoting from cases, the italics are ours.

Since *La Plaisance Bay Harbor Co.* v. *City of Monroe* (1843), Walk. Ch. 155, this court has consistently held that the State has title in fee in trust for the public to submerged beds of the Great Lakes within its boundaries. In that case applied to all navigable waters, the doctrine was early changed with reference to inland lakes and streams, as to which it is the law of the State that the adjoining proprietor owns to the survey lines extended or to the thread of the stream. The latter ruling applies even to the connecting waters of the Great Lakes,

Detroit river (*Lorman* v. *Benson,* 8 Mich. 18 [77 Am. Dec. 435]); St. Clair river (*McMorran Milling Co.* v. *C. H. Little Co.,* 201 Mich. 301); and St. Mary's river (*Ainsworth* v. *Hunting & Fishing Club,* 159 Mich. 61). So, in considering authorities, it is necessary to differentiate between the sea or Great Lakes and other waters in jurisdictions where they are not subject to the same law. The character of the State's title in trust was exhaustively discussed in *Nedtweg* v. *Wallace,* 237 Mich. 14, and need not be repeated here.

Lest we be misled, we must keep it clear that the issue is not as to the ownership of submerged land or of an island arising out of the lake or of lands beyond lines established as definite boundaries by the government or of other distinguishable premises. It covers only dry land, extending meandered upland by gradual and imperceptible accession or recession of the water, on the lake side of the meander line.

The concession in the *Baird Case* that the decision was against the weight of authority, supported by the fact that the contrary authority is substantially unanimous, in State and Federal courts, in this country and England, relieves us of the necessity of detailed consideration of outside cases. Their use will be largely illustrative or cumulative. Our task here is to determine whether, in view of prior decisions of this court, the *Kavanaugh Cases* perpetuated or abrogated a rule of property in this State.

The basis of those decisions, so recognized in the *Baird Case,* was the statement in the *Rabior* opinion, which we divide and number for convenience:

(1) "When the meander line was established it fixed the status of the disputed strip as lake bottom,

and (2) this status in the law would not change even though a portion of it had become dry land.'' 222 Mich. 71, 72.

Independently considered, the first proposition is relatively unimportant. It is of little consequence that the meander line be considered as having definitely and conclusively marked the lake bed when it was run, whether it be so established by proof of fact, legal presumption, or judicial fiat, if subsequent changes of the water's edge would affect the title. But it should be examined because it constitutes the premise for the determinative conclusion that lake bed, so fixed, remains submerged in law after it becomes dry in fact.

Was the meander line a boundary between land and lake when run? It is well known that, in innumerable instances, as in that at bar, the meander line was not run at the water's edge in fact. It is also established that it is not a boundary in law. In *Railroad Co.* v. *Schurmeier* (1868), 7 Wall. (U. S.) 272, 286, it was pointed out that, by the act of congress providing for the survey, while the straight lines were given the force of boundaries, no mention was made of meander lines in the act; that they were a device of the surveyor for the purpose of reporting the contents of the subdivision and to enable the surveyor general to make a plat required by law. They were run as merely general, not accurate, representations of the shore. *Blodgett & Davis Lbr. Co.* v. *Peters,* 87 Mich. 498 (24 Am. St. Rep. 175); *United States* v. *Lane,* 260 U. S. 662 (43 Sup. Ct. 236). A patent from the government was intended to carry title to the water's edge. In the *Schurmeier Case,* the effect of the meander line as a boundary was directly in is-

sue, was discussed at length in the briefs, and the court said:

"Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.

"In preparing the official plat from the field-notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, *that the water-course, and not the meander line, as actually run on the land, is the boundary.*" 7 Wall. (U. S.) 286.

In *Hardin* v. *Jordan* (1890), 140 U. S. 371, 380 (11 Sup. Ct. 808), the court also said:

"It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, *and not for the purpose of limiting the title of the grantee to such meander lines.* It has frequently been held, both by the Federal and State courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that *the waters themselves constitute the real boundary.*"

Authorities to like effect can be multiplied; a few of them, particularly including States on the Great Lakes, are: *State* v. *Korrer,* 127 Minn. 60 (148

N. W. 617, 1095, L. R. A. 1916C, 139); *Doemel* v.
*Jantz,* 180 Wis. 225 (193 N. W. 393, 31 A. L. R. 969);
*Sizor* v. *Logansport,* 151 Ind. 626 (50 N. E. 377, 44
L. R. A. 814); *City of Peoria* v. *Central Natl. Bank,*
224 Ill. 43 (79 N. E. 296, 12 L. R. A. [N. S.] 687);
Black's Pomeroy on Water Rights, p. 471; Kinney
on Irrigation and Water Rights (2d Ed.), pp. 530,
547, 778; 9 C. J. p. 189; 4 R. C. L. p. 97; 23 A. L. R.
778, note.

Under the Federal law, when he bought, then, the
purchaser from the government of public land on
the Great Lakes took title to the water's edge. The
State law became paramount on the title after it
vested in a private person *(Hardin* v. *Jordan, supra);*
but the State cannot constitutionally take away a
vested title without compensation. On its admis-
sion to the Union, the State, as a sovereign, took
title only to such land on the Great Lakes as was
then submerged and was, in fact, lake bed. Except
as to parcels covered by special grant, of no appli-
cation here, the State never has acquired title to
land which was then upland and has continuously
remained dry, even though, by reason of a mistake
of a surveyor, there was such land between the
meander line and the shore when the survey was
made. If such upland did not pass to the original
patentee of the government, it still belongs to the
United States. It is not disputing the private titles
nor claiming the land beyond the meander lines.
The title of the riparian owner to the upland be-
tween the meander line and the lake shore is so sub-
stantially imbedded in principle and authority that
nothing less than a plain and unequivocal declara-
tion to the contrary would justify a ruling that
State law was to the contrary.

Turning to the decisions of this court, we find,
in harmony with the Federal rule, that the meander

line has no force as a boundary as to waters other than the Great Lakes. *Putnam* v. *Kinney,* 248 Mich. 410; *Porter* v. *Selleck,* 236 Mich. 655; *Arnold* v. *Brechtel,* 174 Mich. 147.

In applying a different rule to the Great Lakes, the *Kavanaugh Cases* relied principally on a statement of Mr. Justice GRANT in *Ainsworth* v. *Hunting & Fishing Club* (1909), 159 Mich. 61, 64:

"It is the established law of this State that riparian owners along the Great Lakes own only to the meander line, and that title outside this meander line, subject to the rights of navigation, is held in trust by the State for the use of its citizens. Among these is the common right to fish and hunt."

The facts of the case and the authorities cited upon this proposition make it positive that Mr. Justice GRANT had in mind the emphasizing of the title of the State to the submerged bed of the lake, and that he did not intend to differentiate between the meander line and the water line as a boundary of private ownership. The controversy was on the right of the public to hunt on Munoskong Bay. The sole issue was whether the bay was an arm of St. Mary's river or of Lake Huron. The bill conceded that defendant owned to the water's edge. See 153 Mich. 185, 188 (17 L. R. A. [N. S.] 1236, 15 Ann. Cas. 706, 126 Am. St. Rep. 474). The meander line and the water line were the same. In their briefs counsel treated them as synonymous and used them interchangeably. There was no suggestion of an issue in the case regarding a difference between meander line and shore line as a boundary. Under the particular facts before the court, the statement was sound but *dictum* and misleadingly expressed. The harm lies in wresting it from its setting and applying it to a different situation. Five cases were cited by Justice GRANT:

(1) *La Plaisance Bay Harbor Co.* v. *City of Monroe, supra,* which announced the trust doctrine as to submerged lands and contained no reference to boundaries except "the proprietor of the adjacent shore has no property whatever in the land covered by the water of the lake."

(2) *Lincoln* v. *Davis* (1884), 53 Mich. 375 (51 Am. Rep. 116), involved the public right to fish in Thunder Bay in Lake Huron. It stated the doctrine of the State ownership of the bed of the lake. The majority of the court did not discuss boundaries except to say, "I am not prepared to hold, however, that lands under water are not appurtenant to the upland so far as they can be used at all." Mr. Justice CHAMPLIN, concurring, said:

"What, then, are the boundaries of the grant made by the United States government of the land on Sulphur Island? I have no hesitation in saying that they are limited by low-water mark." 53 Mich. 375, 384.

(3) *People* v. *Silberwood* (1896), 110 Mich. 103, 107 (32 L. R. A. 694), which also stated the trust doctrine, and in which the only reference to boundaries was, with citation of cases: "All hold that the fee of the riparian owner ceases at the low-water mark."

(4) *People* v. *Warner* (1898), 116 Mich. 228, which was a relicted land case and will be more fully discussed later. It also affirmed title of the State in submerged land, and, upon boundary, said:

"If the absence of tides upon the Lakes, or their trifling effect if they can be said to exist, practically makes high and low-water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked. The adjoining proprietor's fee

stops there, and there that of the State begins, whether the water be deep or shallow, and although it be grown up to aquatic plants, and although it be unfit for navigation." 116 Mich. 228, 239.

(5) *State* v. *Fishing & Shooting Club* (1901), 127 Mich. 580, also declared the doctrine of the State's trust title. The majority opinion did not touch on boundaries or meander lines, but Mr. Justice HOOKER, who wrote a separate opinion not concurred in by a majority of the court, but whose views later became the holding of this court, as is pointed out in the *Baird Case,* said:

"It was the uniform practice of its surveyors to run meander lines in proximity to navigable waters, not for the purpose of fixing the limits of its subdivisions, but for the double purpose of defining the water-course, and estimating the amount of land in the several subdivisions bordering upon the water. This has been repeatedly held by the Federal courts, and this court has followed the rule. *Pere Marquette Boom Co.* v. *Adams,* 44 Mich. 403. It never claimed or attempted to sell the land between such meander lines and the shore line, and *it is the settled law of this State that the purchaser of the abutting land takes title to the shore line, regardless of the meander line."* 127 Mich. 580, 587.

And page 590, 127 Mich.:

"Under the cases of *People* v. *Silberwood,* 110 Mich. 103 (32 L. R. A. 694), and *People* v. *Warner, supra,* it must be taken as settled law, that all land submerged, when the water in the lakes stands at low-water mark, is a part of the lake, and the title in the State, *and all land between low-water mark and the meander line belongs to the abutting proprietor, holding under an ordinary patent from the Federal government or State."*

Had Justice GRANT intended to declare the meander line a boundary, when different from the water line, it is hardly possible that he would have cited in support of his statement a group of cases, none of which contains a sustaining utterance, but all of which, so far as they speak on it, are to the contrary. Nor is it probable that he would have overlooked *Brown* v. *Parker,* 127 Mich. 390, which was relied upon in *Kavanaugh* v. *Baird* to sustain the boundary character of the meander line.

*Brown* v. *Parker* involved lands conveyed to the State under the swamp land act. Defendant claimed the public right to hunt and fish on part of plaintiff's description, which was wet and marshy, adjacent to Lake Erie, and claimed to be part of the bed of the lake. Plaintiff relied on the meander line as a boundary. The court said:

"We are of the opinion that the survey by the government, and transfer to and sale by the State to the meander lines, as State swamp land, conclusively establish the boundaries of the lake, and that titles of abutting proprietors extend to them upon the presumption that must be conclusive, *i.e.,* that when the meander lines were run they followed the true shore of the lake. This being determined, and it appearing that there has been little if any change in the condition of the lands, though the sand beach be somewhat lessened, the case falls within the decision of *Sterling* v. *Jackson,* 69 Mich. 488 (13 Am. St. Rep. 405)." 127 Mich. 390, 394.

In holding the meander line a boundary as to swamp lands, the court did not change its previous declarations as to the meander's effect upon public lands and their grant. The opinion was written by Mr. Justice HOOKER and concurred in by the whole court. It was handed down on the same day as

*State* v. *Fishing & Shooting Club, supra,* in which Mr. Justice HOOKER declared the effect of a meander line as quoted above from that case. And in *Brown* v. *Parker* itself, he said:

"The meander lines of rivers and inland lakes, where the title to the bed is in the riparian owner, are of comparatively little significance, and it has frequently been said that they were not run to bound the possessions of the riparian owner, whose title might extend beyond them. *This is true even as to the Great Lakes.* We recall no case, however, that holds in express terms that title does not extend to meander lines. It has frequently been said that they have two purposes—one to make the boundaries of the bodies of water, the other as a means for computing acreage." 127 Mich. 390, 392.

There seem to have been only two other cases of interest on this point, neither of which lends support to the *Rabior* thesis.

*Brown* v. *Parker, supra,* was followed in nine days by *Baldwin* v. *Erie Shooting Club,* 127 Mich. 659, in which it was held that when submerged land within the meander line, *i.e.,* between the line and the lake, was afterward surveyed by the government, patented to the State as swamp land and conveyed by the latter to private persons, it became private property. This denies the basis of the *Kavanaugh Cases* that the meander line legally and unequivocally fixed wet land within it as lake bottom, owned by the State under its trust title. If the State so owned the land, neither the Federal government nor the State had authority to convey it as swamp land. *Nedtweg* v. *Wallace, supra.*

The reconcilement of the apparent conflict upon the effect of a meander line indicated in the above cases and *Sterling* v. *Jackson, supra,* hereafter con-

sidered, affords no difficulty if the difference in the character of lands be kept in mind. Public lands were patented by the United States to individuals for settlement or ordinary use and were generally dry. The meander line was run to show substantially the number of acres to be paid for. It was not meant to be strictly accurate in depicting the precise sinuosities of the shore. The boundary was where nature had placed it—at the water's edge. Swamp lands were given to the State, sold by the latter for the purpose of reclamation and development, and were so wet that where they bordered on a lake or stream they frequently merged into it without a definite shore line. As there was no other means of fixing the limits of the land, the meander line, of necessity, was held to be the boundary. On the basis of this distinction, the decisions of this court upon the effect of the line as a boundary are entirely harmonious. The swamp land cases are not applicable to the issues at bar upon the instant question.

Prior to the *Rabior Case, Ainsworth* v. *Hunting & Fishing Club* seems to have been cited upon boundaries only once, *i. e.,* in *La Porte* v. *Menacon,* 220 Mich. 684, in which the court held that a conveyance to the "westerly shore of Lake Erie" carried ownership to lowest watermark. This case is not authority here because it involved merely the construction of a private grant. But it has some force as demonstrating that this court, in common with public opinion and in harmony with the weight of authority, assumed, without question, that the upland proprietor owns to the water's edge, and that his title did not stop at a meander line; and it so applied and cited the *Ainsworth Case.*

It also seems that, in the *Baird case,* this court was not without doubt of the soundness of the

*dictum* of Justice GRANT in the *Ainsworth Case* and of the first proposition in the basis of the *Rabior* decision, as it went to some trouble to discuss and hold, as proved by the record in fact, that the meander line had been accurately run at the water's edge.

It thus appears that, aside from the *dictum* in the *Aïnsworth Case,* there was no support in the decisions of this court for the treatment of the meander line as a boundary of public lands. On the contrary, its want of such force so completely had been established by the Federal law and so often recognized and stated by this court that it was a settled rule of property that the purchaser of meandered public land on the Great Lakes took to the water's edge. Until the *Kavanaugh Cases,* as we shall see, this court was in accord with other American courts in applying the common law of waters, and had not established a rule of property as to land upon the Great Lakes contrary to the law of the sea.

This brings us to the second proposition of the *Kavanaugh Cases,* that the status of land as lake bottom, fixed when the meander line was run, did not change in law even though a portion of it afterward became dry land. In the *Rabior Case,* no reasoning or authority was adduced in support of this proposition. In the *Baird Case,* an attempt was made to sustain it upon the authority of *Sterling* v. *Jackson, supra,* and *State* v. *Venice of America Land Co.,* 160 Mich. 680.

*Sterling* v. *Jackson* involved the converse of reliction, that is, loss of title by inundation. There, the land had been conveyed to the State under the swamp land act, and plaintiff later had purchased it. The strip upon which the meander line had been run had partly washed away and part of the property

had become covered with open waters of Lake Erie.
Plaintiff brought trespass against defendant for
hunting on the inundated land. The court held that
plaintiff's title was not affected by a change in the
condition of the shore. The ruling was based upon
the claim that *the change had occurred while the
State still owned the land.* When the reasons are
noted, the ruling loses. the authority claimed for it
in the *Baird Case,* as applied to reliction to public
lands during private ownership.

Two paragraphs of the syllabus, which was pre-
pared by Justice CHAMPLIN, who wrote the opinion,
demonstrate the special nature of swamp lands and
the view of the court upon the different effects which
would follow a change in the shore line under State
and private ownership.

"4. Lands lying in the State of Michigan which
belonged to the United States at the date of the
passage of the act of September 28, 1850, and which
came within the class of swamp and overflowed lands
referred to in that act, became the property of the
State of Michigan, and any change in the condition
of such lands afterwards from natural causes,
whether they become dryer or more overflowed,
could not deprive the State of its title to such lands.
Consequently, if after such grant the waters of the
Great Lakes made, through natural causes, inroads
upon portions of such lands, and forced the shore
lines inward, *the soil under the water remained
the property of the State,* and subject to its control
and disposition. *In this respect the State, in virtue
of its sovereignty over its domain, is unlike an in-
dividual.* A grant from the State to an individual
of such submerged and overflowed land conveys the
title of such land to such grantee. Especially is this
so with respect to the swamp and overflowed lands
granted to the State by the act of congress.

"5. Where such lands are granted to, and in the hands of, private owners, and have been encroached upon by the navigable waters of the Great Lakes, until such owners construct dykes or levees which prevent, there is an implied license to the public to enter upon and use and navigate such waters, and to exercise all the rights incident to navigation."

The reasons are thus stated:

"A point is made by counsel for defendant that, at the time the State issued its patent for this land in 1883, the shore had washed away, and the bay existed as a part of the waters of Lake Erie, and the mere grant of the land could convey no greater rights, as to fishing and shooting, to the grantee than the grantor had.

"It seems to me that plaintiff is unaffected by the changed condition of the shore. In my opinion, the grant was effective to pass the title to the submerged land. The patent from the State passed such title as it had; and *if, prior to its date,* a portion of the land had become submerged by the slow and imperceptible encroachments of the waters of the lake, the State, *unlike a private person, still would be the owner,* and could grant the bed of the lake to whom it chose, so long as such grant did not interfere with private vested rights."

It may be suggested that the reasoning upon the power of the State to grant the bed of the lake to whom it chooses, which is the common-law doctrine of *jus privatum* of the crown, is not in strict accord with *Nedtweg* v. *Wallace, supra,* in which the doctrine is discussed. Granting this, the decision nevertheless negatives the claim made for it in the *Baird Case,* and shows this court squarely planted upon the common law of waters, both by the use of such reasoning and by its clear recognition, in the italicized words, of the law of the sea, that where

private property is permanently encroached upon by open waters, the proprietor loses his title and it passes to the State as part of the bed, so that a change of condition during private ownership works a change of title.

The other authority cited was the statement by Mr. Justice STONE in *State* v. *Venice of America Land Co., supra,* that "the condition of this territory when the State was admitted into the Union is the condition which must control." The precise condition of the premises did not clearly appear in the opinion, but it was shown in the record in *State* v. *Fishing & Shooting Club, supra,* involving the same island in St. Clair Flats. The grants to private owners were not bounded by a meander line, but were surveyed by "stakes and mounds" and did not run to the shore. No question was raised of reliction, riparian rights, or change of conditions as affecting title. The issue was whether the premises claimed by the State were in fact submerged when it was admitted to the Union. It was with reference to such issue the statement was made. It is to be noticed that, although decided within four months after the *Ainsworth Case* and citing it upon the State's title to submerged land, the court did not mention it upon boundaries. Had the court which had decided it given the *Ainsworth dictum* the effect claimed for it in the *Kavanaugh Cases,* most of the long discussion by Mr. Justice STONE was unnecessary. It is fair to presume that he would have made some reference to such effect if the court had so understood it.

Upon review and analysis, it becomes apparent that the basis of the *Kavanaugh* opinions was not sustained by the decisions of this court upon either proposition. On the contrary, this court often had

declared the effect of a meander line upon the Great Lakes in harmony with authority elsewhere, and, at least inferentially, had recognized that title would follow the shore in case of change of condition under private ownership, in accordance with the common law. And as further evidence that this court was in accord with the common law of waters and with other American courts and had not established a rule of property as to land upon the Great Lakes contrary to the law of the sea, an excerpt from *People* v. *Silberwood, supra,* may be presented. After quoting at length from *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387 (13 Sup. Ct. 110), on the title of the State to the bed of the Great Lakes, a part of which was as follows:

" 'We hold, therefore, that the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters of the Great Lakes applies which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea, and that the lands are held by the same right in the one case as in the other, and subject to the same trusts and limitations.' "   110 Mich. 108.

This court said:

"It seems to me the reasoning of this case is without flaw, and that the law enunciated therein ought to stand as the law of this State. It commends itself to one's reason and judgment, and avoids many difficulties incident to a different construction of the law. It is in harmony with the doctrine laid down in the early case of *La Plaisance Bay Harbor Co.* v. *City of Monroe,* which I do not think has ever been overruled in this State so far as it affects the rights of shore owners on the borders of the Great Lakes. This doctrine, too, is in harmony with the

decisions in all of the States bordering on these great seas." 110 Mich. 108.

See, also, *Sewers* v. *Hacklander,* 219 Mich. 143.

Another serious objection to the *Kavanaugh Cases* is that they departed from principle and authority in holding that, although the State has title in fee to relicted land, the upland owner has riparian rights. It is settled law both in this State and elsewhere, so settled that no contrary authority has been cited, that the interposition of a fee title between upland and water destroys riparian rights, or rather transfers them to the interposing owner. The basis of the riparian doctrine, and an indispensable requisite to it, is actual contact of the land with the water. *Monroe Carp Pond Co.* v. *River Raisin Paper Co.,* 240 Mich. 279; *Stark* v. *Miller,* 113 Mich. 465; *Palmer* v. *Dodd,* 64 Mich. 474; *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53 (33 Sup. Ct. 667); *Illinois Central R. Co.* v. *Illinois, supra; Irvin* v. *Crammond,* 58 Ind. App. 540 (108 N. E. 539); Gould on Waters (3d Ed.), p. 298; 1 Farnham on Waters and Water Rights, pp. 281, 304; 45 C. J. pp. 527, 494, 495.

They also disregarded another established rule, that the right to acquisitions to land, through accession or reliction, is itself one of the riparian rights. 27 R. C. L. pp. 1070, 1375; 45 C. J. p. 491; Black's Pomeroy on Water Rights, p. 517; *Murray* v. *Gordon,* 182 Ill. App. 460.

If the main theme of the *Kavanaugh Cases* is sustained, it would seem that consistency would require a holding that the private proprietor has no riparian rights unless, of course, the fiction be imagined and held fast that relicted land, however dry in fact, is still under water in law, which seems to have been

the basis for the ruling preserving such rights. Such a fiction is pure invention.

Prior to the *Kavanaugh Cases* there appears to have been little or no conflict of law upon the effect of reliction on title. The law of the sea applies to the Great Lakes. *Hardin* v. *Jordan, supra.* All maritime nations, recognizing the vagaries of the sea, beyond human control and anticipation, have evolved systems of law, founded upon rational conceptions of common justice, to adjust and compensate its effects. The most ordinary effect of a large body of water is to change the shore line by deposits or erosion gradually and imperceptibly. In such cases it is the general, possibly universal, rule, except for the *Kavanaugh Cases,* and except in a few States where riparian rights have been extinguished by Constitution or statute, that the title of the riparian owner follows the shore line under what has been graphically called "a movable freehold." 28 Halsbury, Laws of England, 361. It remained for this court to put the Great Lakes in a legal strait-jacket.

The rule of reliction was stated in *Shively* v. *Bowlby,* 152 U. S. 1 (14 Sup. Ct. 548):

"The rule, *everywhere admitted,* that where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land, is equally applicable to lands bounding on tide waters or on fresh waters, and to the King, or the State as to private persons; and *is independent of the law governing the title in the soil covered by the water.*" Page 35.

"'The reason ordinarily given for the rule is that it is necessary to preserve the riparian owner's right of access. Other reasons sometimes are that it is within the maxim, *de minimis non curat lex,* or

that since the riparian owner may lose soil by the action of the water he should have the benefit of any land gained by the same action." 45 C. J. p. 525.

Some of the other authorities stating the rule are: *Barney* v. *Keokuk*, 94 U. S. 324; Coulson & Forbes Law of Waters (4th Ed. [Eng.]), 36; Angell on Water Courses, p. 65; Gould on Waters (3d Ed.), pp. 298, 306, 307; 1 Farnham on Waters and Water Rights, pp. 320, 324, 329; Woolrych on Waters, p. 34; Black's Pomeroy on Water Rights, p. 546; 45 C. J. p. 525; 27 R. C. L. pp. 1070, 1375.

In cases directly involving the Great Lakes, the rule of reliction was applied in *Banks* v. *Ogden*, 2 Wall. (U. S.) 57, and *Brundage* v. *Knox*, 279 Ill. 450 (117 N. E. 123). It was applied to an inland lake, but which is governed by the Great Lakes rule of State ownership, in *Doemel* v. *Jantz, supra*. The converse doctrine, loss of title by erosion, was applied to Great Lakes in *Matter of Buffalo*, 206 N. Y. 319 (99 N. E. 850), and *Servos* v. *Stewart*, 15 Ont. L. R. 216.

The same rule was applied by this court as to an inland river in *Sewers* v. *Hacklander, supra;* and in *Weston* v. *Dunn*, 168 Mich. 563, as to land on an arm of Lake Huron, with at least the intimation that title by accretion could extend beyond the meridian line boundary of the property.

But we are not left to analogy or intimation in ascertaining the law of this State upon the title to relicted land prior to the *Kavanaugh Cases*. *People* v. *Warner*, 116 Mich. 228 (1898), is directly in point. The case involved two issues, the second of which was discussed in *Kavanaugh* v. *Baird*.

In 1853 Maisou Island, in Saginaw Bay, Lake Huron, was surveyed by the Federal government. East of it the surveyor found lands which he did not survey, but which he indicated on the plat as

two small islands and denominated ''Wet Marsh.'' By recession of the water, part of the bed of the bay around all three islands became dry land and was called ''Middle Ground.'' Warner had purchased Maisou Island and was in possession of the relicted land. The State brought ejectment. Warner claimed his purchase gave him title to all land and water, including the small islands, to the center of the main channel of the bay. This was his second point, and was rejected by the court because ''the title to the fee in the submerged land belongs to the State.'' He also claimed the dry land as reliction to Maisou Island. The court found the State owned the small islands, either under the swamp land act or by virtue of its ownership of the bed of the lake, and held it an issue of fact for the jury to determine what part of the Middle Ground had been attached by reliction to Maisou Island and what part to the small islands. The court said:

''Upon the subject of accretions, we understand the law to be that additions to the land of a littoral proprietor by the action of the water, which are so gradual as to be imperceptible, become a part of the land, and belong to the owner of the land, but, when not so, they belong to the State. So, if, by the imperceptible accumulation of soil upon the shore of an island belonging to a grantee of the government, or by reliction, it should be enlarged, such person, and not the State, would be the owner; but if an island should first arise out of the water, and afterwards become connected to that of the private proprietor, it would not thereby become the property of such person, but would belong to the State. See 1 Am. & Eng. Enc. Law (2d Ed.) 467, *et seq.,* and cases cited. It will.be seen by the map that the point at which Maisou Island and the Middle Ground approach each other nearest is on the S. W. ¼ of section 8. If the Middle Ground or any

part of it is an accretion to Maisou Island, it is by reason of the growth of the former from this point; and it becomes important to know whether the land was washed up against Maisou, and gradually extended that point eastward and northward, or whether land arose from the water to the northward and eastward, and gradually approached Maisou, until a gradually-narrowing water passage was obliterated at times of low water. In the former case there may be force in the claim that there was an accretion to Maisou, and it would then become important to know how far it extended. We are of the opinion that this was a question for the jury, and should not have been taken from them. We have here, therefore, a question of fact as to whether any, and, if so, what, portion of the Middle Ground is an accretion to Maisou. As to such extent the defendants would be entitled to a verdict." 116 Mich. 239.

The *Kavanaugh Cases* overruled *People* v. *Warner,* in effect. They abrogated a rule of property in force in this State, specifically declared by the decisions of this and the Federal courts, under which the people had purchased public land, held, improved, bought, and sold it from the earliest times. Upon the authority in this State, as well as elsewhere, the *Kavanaugh Cases* should be overruled.

A few other matters, however, may be noticed. In *Kavanaugh* v. *Baird* appears the statement:

"To overrule the *Rabior Case* would require us to overrule *Sterling* v. *Jackson, supra, State* v. *Venice of America Land Co., supra,* and probably *Ainsworth* v. *Hunting & Fishing Club, supra, Brown* v. *Parker, supra,* and the cases which have followed them." 241 Mich. 252.

This observation is untenable. None of the cases involved the issue of reliction. *Sterling* v. *Jackson*

and *Brown* v. *Parker* were swamp land cases in which, although the court gave the meander line the special force of a minimum boundary, it recognized its true effect as applicable to public lands. In *State* v. *Venice of America Land Co.*, the grants did not run to the shore nor present a case of reliction or riparian rights. Overruling the *Kavanaugh Cases* would not require overruling any prior decision of this court, except the unmeant *dictum* in the *Ainsworth Case*, but would re-establish *People* v. *Warner, supra,* overruled by them.

The doctrine of *stare decisis* has been invoked. The point has much force. Titles should be secure and property rights stable. Because a judicial decision may apply to past as well as to future titles and conveyances, a change in a rule of property is to be avoided where fairly possible. But where it clearly appears that a decision, especially a recent one, was wrong and continuing injustice results from it, the duty of the court to correct the error is plain. The *Kavanaugh Cases* were decided in the recent years in 1923 and 1928, respectively. They enumerated principles at variance with settled authority in this State and elsewhere, under which real estate transactions long had been conducted and given legal effect by courts and citizens, and, themselves, disregarded the doctrine of *stare decisis* by overruling the *Warner Case,* decided in 1898. The rules they stated are not as old as the rules they abrogated. When to that are added the considerations that they operated to take the title of private persons to land and transfer it to the State, without just compensation, and the rules here announced do no more than return to the private owners the land which is theirs, the doctrine of *stare decisis* must give way to the duty to no longer perpetuate error and injustice.

With much vigor and some temperature, the loss to the State of financial and recreational benefit has been urged as a reason for sustaining the *Kavanaugh* doctrine. It is pointed out that public control of the lake shores is necessary to insure opportunity for pleasure and health of the citizens in vacation time, to work out the definite program to attract tourists begun by the State and promising financial gain to its residents, and to conserve natural advantages for coming generations. The movement is most laudable and its benefits most desirable. The State should provide proper parks and playgrounds and camping sites and other instrumentalities for its citizens to enjoy the benefits of nature. But to do this, the State has authority to acquire land by gift, negotiation, or, if necessary, condemnation. There is no duty, power, or function of the State, whatever its claimed or real benefits, which will justify it in taking private property without compensation. The State must be honest.

Perhaps, also, some of the apprehension of the extent of the injury to the State and its citizens would be allayed if the scope of the *Kavanaugh* decisions were not so misunderstood and misrepresented.

The notion seems to be widespread, in official as well as in private circles, that they gave the State substantially absolute title so it can sell or lease the lake shores to strangers to the upland or use them for any public purposes. On the contrary, while declaring the legal title in fee to be in the State, they confined its ownership to the same trust which applies to the bed of the lake, *i. e.*, that the State has title in its sovereign capacity and only for the preservation of the public rights of navigation, fishing, and hunting. The State cannot divest itself of such trust, cannot sell the land, and cannot lease it for

any purpose which would injure the trust or affect riparian rights. *Nedtweg* v. *Wallace, supra.*

The possibility of use of the lake shores by the State for the paramount trust purposes is so remote as to be practically negligible; so, by holding that the upland owner has riparian rights, the *Kavanaugh* decisions declared little, if any, more than a naked legal title in the State, without practical right of use. This is demonstrated by a consideration of some of the riparian rights, with special reference to the use of the relicted land by the State for park and recreational purposes.

Generally speaking, riparian rights are:

(1) Use of the water for general purposes, as bathing, domestic use, etc. (2) To wharf out to navigability. (3) Access to navigable waters. 27 R. C. L. pp. 1070, 1375; 45 C. J. p. 491; Black's Pomeroy on Water Rights, p. 517.

These rights were declared in the *Baird Case,* but it rejected the other, approved by the authorities—

(4) The right to accretions.

Riparian rights are property, for the taking or destruction of which by the State compensation must be made, unless the use has a real and substantial relation to a paramount trust purpose. 45 C. J. p. 491; 1 Farnham on Waters and Water Rights, p. 297; *United States* v. *River Rouge Improvement Co.,* 269 U. S. 411 (46 Sup. Ct. 144); *Illinois Central R. Co.* v. *Illinois, supra.* The State cannot impair or defeat riparian rights by a grant of land under water (*McLennan* v. *Prentice,* 85 Wis. 427 [55 N. W. 764, 23 A. L. R. 772, note]); nor cut off the owner's access to the water by construction of a highway (1 Farnham on Waters, p. 301); nor grant to strangers the right to erect wharves in front of his property (*Id.,* pp. 382, 383); nor erect a

bathhouse on the shore to interfere with the right of access (*Tiffany* v. *Oyster Bay*, 234 N. Y. 15 [136 N. E. 224, 24 A. L. R. 1267]). On the contrary, the right of the State to use the bed of the lake, except for the trust purposes, is subordinate to that of the riparian owner (*Town of Orange* v. *Resnick*, 94 Conn. 573, 578 [109 Atl. 864, 10 A. L. R. 1046]), where it was said:

"The only substantial paramount public right is the right to the free and unobstructed use of navigable waters for navigation."

Most of the upland owner's rights are included in the general right of access, which is quite broad.

"The right attaches equally to the whole and every part of his shore line and no one has the right to fetter or impair his enjoyment of his property by compelling him to go upon it only at certain points." 27 R. C. L. p. 1377, citing *Johnson* v. *Jeldness*, 85 Ore. 657 (167 Pac. 798, L. R. A. 1918A, 1074).

The riparian owner has the exclusive use of the bank and shore, and may erect bathing houses and structures thereon for his business or pleasure (45 C. J. p. 505; 22 L. R. A. [N. S.] 345; *Town of Orange* v. *Resnick, supra*); although it also has been held that he cannot extend structures into the space between low and high-water mark, without consent of the State (*Thiesen* v. *Railway Co.*, 75 Fla. 28 [78 South. 491; L. R. A. 1918E, 718]). And it has been held that the public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner, although the title is in the State. *Doemel* v. *Jantz, supra*.

Instead of aiding in working out the recreational aspirations of the State, it would seem that the

effect of the *Kavanaugh* doctrine is destructive of the development of the lake shores. While the upland owner, in a general way, has full and exclusive use of the relicted land, his enjoyment of its use, especially his freedom to develop and sell it, is clouded by the lack of fee title, the necessity of resorting to equity or to action for damages instead of ejectment to expel a squatter, and the overhanging threat of the State's claim of right to occupy it for State purposes. The State, except for the paramount trust purposes, could make no use of the land, and it loses nothing of practical value by the overruling of the *Kavanaugh Cases.* But it directly gains the right to levy and collect taxes on the relicted land, the great value of which supports the argument that such taxes will more than compensate the people for the loss of an empty title.

*Kavanaugh* v. *Rabior* and *Kavanaugh* v. *Baird, supra,* are overruled. The *dictum* in *Ainsworth* v. *Hunting & Fishing Club, supra,* "that riparian owners along the Great Lakes own only to the meander line," is overruled.

Under this ruling, defendants suffered no damage from misrepresentation of the boundary line.

The decree will be reversed and plaintiffs have decree of foreclosure, but with recomputation of the amount due and with costs to plaintiffs.

BUTZEL, CLARK, SHARPE, and NORTH, JJ., concurred with FEAD, J.

POTTER, J. (*concurring*). The title to the land submerged by the waters of the Great Lakes within the territorial boundaries of the State of Michigan is in the State in trust for all its natural and ordinary uses by the public, subject to the right of congress to use and control the same in the exercise by

it of the paramount power to control and regulate public navigation incidental to interstate and international commerce.

Meander lines are not boundaries, they are lines run by the surveyors of public lands by direction of the surveyor general of the United States for the purpose of computing the acreage of fractional parcels for which the purchaser should pay upon acquiring them from the government of the United States.

The Great Lakes are fresh water, not salt water; above sea level, not at sea level; subject to drainage, not fixed and permanent, and subject to variation in level due to seasonal causes, evaporation and precipitation. The law of the sea governs the Great Lakes only so far as applicable. The doctrine of reliction has no application to lands temporarily laid bare by a recession of the water due to variation in the amount of evaporation and precipitation, nor to lands laid bare by a recession of the water due to diversion or drainage.

Whether the title to the lands between the water's edge at high-water mark and low-water mark is in the riparian proprietor or in the State for the use and benefit of the public, including the riparian proprietor, is not important. If the title is in the State it holds it as a mere naked trustee subject to the right of access, to wharf and dock out, the right of bathing, the right to use, for domestic and agricultural purposes, the waters of the lake, and subject to all other rights of the riparian proprietor. The State has no power to divest itself of this trust. It may not sell and convey title to this land, interfere with the riparian proprietor's rights or the beneficial use thereof by such riparian proprietor, constitute such lands a public park, prevent the riparian proprietor from operating mines, pits, or quarries

thereon, or exercise dominion and control over it to the exclusion of the riparian proprietor, or in interference with his rights, without condemnation of the rights of the riparian proprietor and the payment of just compensation therefor. I concur in the result reached by Mr. Justice FEAD.

NORTH, J., concurred with POTTER, J.

WIEST, C. J. (*dissenting*). This case presents nothing new. The opinion of Mr. Justice FEAD overturns a rule of property of great public moment, firmly fixed by repeated decisions of this court, takes from the sovereign State a vested public trust, and, contrary to such trust, vests title in fee in private parties, without the trustee or beneficiaries being parties litigant.

Plaintiffs sold and defendants purchased the land by government description.

It is elementary knowledge that meander lines were run for the purpose of ascertaining the quantity of upland to be charged for upon sale by the government. In this State the Federal government conveyed nothing between the meander line and water, considering such strip, if any, to vest in the State in its capacity of sovereign, in trust, leaving disposition thereof to State law, not counter to riparian or littoral rights. The United States never surveyed for sale or other disposition land between the meander line and waters of the Great Lakes and never sold or disposed of the same. The State of Michigan, upon admission to the Union, took all such land in its capacity as sovereign in trust for all time for all the people.

Upon inland waters, inclusive of all rivers, the law of this State has not limited title to the meander line, but, in rivers, to the center of the thread of the stream (*Sewers* v. *Hacklander*, 219 Mich. 143), and,

in lakes, into the waters, subject to certain public rights in navigable waters and Federal regulation of navigation, not here involved or necessary to be mentioned. Upon the Great Lakes proprietary titles have never extended beyond the meander line. This has been uniformly adjudged by this court in many cases. The last utterance having been written by Mr. Justice POTTER and unanimously adopted. *Newman* v. *Bump*, 245 Mich. 665. That case is on all fours with this.

In *Ainsworth* v. *Hunting & Fishing Club*, 159 Mich. 61, it was held:

"It is the established law of this State that riparian owners along the Great Lakes own only to the meander line, and that title outside this meander line, subject to the rights of navigation, is held in trust by the State for the use of its citizens."

The law on this subject has been so long settled in this State as to forbid looking beyond our decisions. *Lincoln* v. *Davis*, 53 Mich. 375 (51 Am. Rep. 116); *People* v. *Silberwood*, 110 Mich. 103 (32 L. R. A. 694); *People* v. *Warner*, 116 Mich. 228; *State* v. *Fishing & Shooting Club*, 127 Mich. 580; *Ainsworth* v. *Hunting & Fishing Club, supra; Olds* v. *Commissioner of State Land Office*, 150 Mich. 134; *State* v. *Venice of America Land Co.*, 160 Mich. 680; *Kavanaugh* v. *Rabior*, 222 Mich. 68; *Kavanaugh* v. *Baird*, 241 Mich. 240; *Newman* v. *Bump, supra*.

We again hold that, on the Great Lakes, within this State, from the meander line to the water's edge, the adjoining proprietor has littoral rights in the nature of a permanent easement of unobstructed access to the water, but no title in fee. If the water recedes his easement follows. Title to soil *under* the waters of the Great Lakes, opposite private lands, and to the meander line, is in the State, in

trust, and not as proprietor. Recession of water relicting lakebed opposite the holding of an upland proprietor does not give the upland proprietor title thereto, nor enable the State to exercise alienability thereof.

It is not necessary under the issue to detail littoral rights under the perpetual easement.

My Brother's opinion is far-reaching, for it constitutes the Michigan shore line of 1,624 miles private property, and thus destroys for all time the trust vested in the State for the use and benefit of its citizens.

Plaintiffs are entitled to a decree of foreclosure of the land contract, and defendants' cross-bill should be dismissed.

Reversed, with costs to plaintiffs.

McDONALD, J., concurred with WIEST, C. J.