KLAIS *v.* DANOWSKI.

APPEAL OF STATE.

1. EVIDENCE—VARIATION IN SHORELINE OF GREAT LAKES.
    The history of variation in lake levels or elevations of the Great Lakes throughout the years renders it entirely possible that surveys based on shorelines will vary in the course of an 8-year period.

2. SPECIFIC PERFORMANCE—LAND CONTRACT—SUBMERGED LANDS—STATUTES.
    Record presented in suit for specific performance of land contract to convey lots near the shoreline of one of the Great Lakes *held,* to require a finding that lots in question were landward of shoreline as it existed at time lands were patented, hence, were not subject to statutes pertaining to submerged lands (PA 1955, No 247, as amended by PA 1958, No 94).

3. BOUNDARIES—COURSES AND DISTANCES—NATURAL OBJECTS.
    Principle that course and distance must yield to natural objects called for in a United States patent is inapplicable, where relevant posts and beech tree cannot now be found and border of

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur, Evidence § 56.
[2] 49 Am Jur, Specific Performance § 92.
[4, 6] 49 Am Jur, States, Territories, and Dependencies § 10.
[5] 56 Am Jur, Waters § 459.
[7, 10, 11] 56 Am Jur, Waters §§ 476, 477.
[8] 56 Am Jur, Waters § 448 *et seq.*
[9–11] 56 Am Jur, Waters § 207 *et seq.*
[12] 14 Am Jur, Costs § 92.

Great Lake as of time of patent is not established by proofs except as fixed by measurement.

4. STATES—LANDS PATENTED PRIOR TO STATEHOOD—TITLE.

Title to lands conveyed by the United States patentees before Statehood does not pass to the State upon admission into the Union.

5. SAME—LANDS—NAVIGABLE WATERS—ADMISSION TO STATEHOOD—TREATIES.

Lands underlying navigable waters within a State belong to the State in its sovereign capacity, and may be used and disposed of as it may elect, subject to the paramount power of congress to control such waters for the purposes of navigation in interstate and foreign commerce and subject to previously granted rights in performing treaty obligations (PA 1955, No 247, as amended by PA 1958, No 94).

6. SAME—NAVIGABLE WATERS—LAND—PATENTS BY UNITED STATES.

Rights to land, whether above or beneath navigable water, which had been granted by the United States to patentees in fulfillment of treaty obligations were not cut off by the subsequent creation of the State (PA 1955, No 247, as amended by PA 1958, No 94).

7. NAVIGABLE WATERS—PATENTS OF SUBAQUEOUS LANDS—AVULSION—EROSION.

Title to subaqueous lands under navigable water, which has been patented by the United States to private individuals pursuant to treaty obligations are not lost to the patentees and their assignees by reason of the processes of avulsion or erosion or when their condition as dry land is restored by artificial, man-made means.

8. SAME—GREAT LAKES—SUBAQUEOUS LAND—STATUTES.

The Great Lakes submerged lands act applies only to unpatented submerged lake bottom lands and unpatented made lands in the Great Lakes belonging to the State or held in trust by it (PA 1955, No 247, as amended by PA 1958, No 94).

9. SAME—PATENTS—DESCRIPTIONS—RIPARIAN RIGHTS.

Descriptions of land in patents thereof from the United States which extend to posts on the border of a Great Lake manifest an intention that riparian rights should be and were included.

10. SAME—PATENTS—DESCRIPTION—GREAT LAKES—RIPARIAN RIGHTS—ACCRETION.

The description of land in a United States patent thereof, which states that it extends to a Great Lake must be held to mean, in the absence of a clearly expressed contrary intent, to extend

at least to the border of the lake as of the date of the patent, and by reason of riparian rights and the consequent right to accretions beyond, of and when accretions or relictions cause the border of the lake to recede further lakeward.

11. SAME—RIPARIAN RIGHTS—ACCRETION—RELICTION.
   The right to acquisitions of land, through accretion or reliction, is itself one of the riparian rights of an upland owner bordering a Great Lake.

12. COSTS—AFFIRMANCE—BRIEFS.
   No costs are allowed plaintiffs on intervening plaintiff's appeal from decree for plaintiffs, where they filed no brief.

Appeal from Macomb; Carroll (Howard R.), J. Submitted January 9, 1964. (Calendar No. 2, Docket No. 49,728.) Decided July 8, 1964. Rehearing denied September 2, 1964.

Bill by Ferdinand Klais and Ella L. Klais against Julius Danowski and Beatrice Danowski for specific performance of land contract, particularly in respect to delivery of marketable title. The State of Michigan, *ex rel.* Gerald E. Eddy, director of the department of conservation, intervened as party plaintiff asking that filled property be declared part of submerged bottom lands of Lake St. Clair, title to which reposed in the State. Decree for plaintiffs, with finding that State had no interest in land. Intervening plaintiff appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Nicholas V. Olds* and *Jerome Maslowski,* Assistant Attorneys General, for intervening plaintiff.

*Meyer D. Stein (Stanley E. Beattie,* of counsel), for defendants.

DETHMERS, J. The paramount question is whether the area of the 2 lots, hereinafter described, is a

part of the State-owned, unpatented, submerged lands of the Great Lakes and, as such, subject to PA 1955, No 247, as amended by PA 1958, No 94 (CLS 1961, § 322.701 *et seq.* [Stat Ann 1958 Rev and Stat Ann 1963 Cum Supp § 13.700(1) *et seq.*]), which provides that occupants on unpatented, filled-in bottom of the Great Lakes may apply to the State for conveyances of the State's interest therein and authorizes such conveyances to them, for a consideration, by the department of conservation.

Plaintiffs are purchasers from defendants, under land contract, of the 2 lots, described as follows: "Lots 82 and 83 of Schulte's Shores Subdivision No 2, a replat of lot 7 of Assessor's Plat No 20 of part of lots 6 and 7 of Abbott's Subdivision of Private Claims 599 and 623, village of St. Clair Shores, Macomb county." The area in question, containing these lots, lies along the west side of Lake St. Clair. It was filled in during 1931–1932.

Plaintiffs filed their bill of complaint, alleging that, by the terms of the land contract, defendants agreed to convey by warranty deed, free from all encumbrances; that the lots are filled-in lake bottom; that the State claims them as part of submerged lake bottom of the Great Lakes, artificially filled in, and that under the above mentioned statute application would have to be made to the State for a conveyance of the State's interest. Plaintiffs prayed that defendants, in order to fulfill their agreement to convey clear title, be required to join them in such application to the State and to pay the State or reimburse plaintiffs for the amount paid by them to the State for such conveyance.

The State, on petition granted, intervened as party plaintiff and asserted the rights above indicated. Defendants denied that the State ever had title to the lands, and pointed out that the mentioned statute applies only to unpatented submerged lake

bottom or unpatented made lands in the Great Lakes, but that the lots in question are and since 1811 have been part of patented lands, namely Private Claim 623, and, therefore, do not come within the purview of that statute. Private Claim 599 lies adjacent to and south of 623. The lots in question definitely are not part of 599 but the latter is discussed in this case with 623 because of their like factual background and both were patented, on the same date, to the same patentees, with the western boundary of one claim being an extension of that of the other. The dispute centers around whether the lots are lakeward or landward of the east or lakeward boundary of Private Claim 623 and, thus, within or outside of its boundaries as of the time of patent. This, in turn, it is argued, depends on or can only be determined from decision of the disputed question of where the western boundary of Claim 623 was when patented.

The circuit court entered a decree adverse to the claims of the State. It appeals here.

The land patent to Private Claim 623, dated June 1, 1811, to the legal heirs of James Abbott, Esq., contains the following description:

"A certain tract of land containing 639-99/100 acres situate on the border of Lake St. Clair bounded and described as follows, to-wit: Beginning at a post standing on the border of Lake St. Clair between this tract and a tract confirmed to the claimants, thence north 75 degrees west 102 chains 8 links to a post, thence north 15 degrees east 71 chains 58 links to a beech tree the boundary between this tract and unconceded lands; thence south 75 degrees east 80 chains 49 links to a post standing on the border of Lake St. Clair; thence along the border of said lake south 2 degrees west 54 chains 75 links; thence south 12 degrees east 20 chains 46 links to the place of beginning."

The description in the patent is based on a survey made for that purpose in 1810 by Aaron Greeley. It will be noted that the claim was described as containing 639.99 acres; that the southerly line was 102 chains 8 links in length and the northerly line was 80 chains 49 links in length, which had, as their easterly termini, posts described as standing on the border of Lake St. Clair, and that the easterly boundary ran along the border of said lake, between those 2 posts. Where that lake border then was, except as it may be ascertained from the description, is not now definitely known from any independent sources. The westerly boundary ran from a post at the claim's southwest corner north 15° east for 71 chains 58 links to a beech tree which was at the northwest corner of the claim. That tree and the 3 mentioned posts or any physical evidences of their location are not to be found today.

Where was the westerly boundary when the patent issued? The answer is important because the Greeley survey and description in the patent locate the lakeward boundary as being a specific number of chains and links easterly or lakeward, on a certain course, from the westerly boundary or, at least, from the southwest and northwest corners of the claim, and they call for an area of 639.99 acres. Thus, if the westerly boundary were ascertained, the lengths of the northerly and southerly boundaries and the total of acreage would serve to locate the easterly boundary on the lake side.

When the patents for Private Claims 623 and 599 issued the adjacent lands to the north and west were unconceded. For the purpose of subdividing and surveying out those lands or public domain for sale to settlers, one William Preston, United States deputy surveyor, in January of 1818, made a survey of those unconceded lands. He was not authorized or commissioned to survey Private Claims 599 and 623

as they already had been surveyed in 1810 by Aaron Greeley. In his survey of the unconceded lands surrounding Claims 599 and 623 Preston did, however, delineate the outlines of those claims, to separate them from the unconceded lands. It is said, for the State, that the effect of the Preston survey was to move the westerly boundary of claims 599 and 623 easterly 19.40 chains toward Lake St. Clair and to eliminate some 250 of the 1,280 acres of those 2 claims as confirmed by patents to the heirs of James Abbott. This, apparently, is concluded from the fact that on the northerly side of the north line of Claim 623, separating it from unconceded land being surveyed by Preston, as shown by the plat prepared by him, the distance between the northwest corner of Claim 623 and the lake is written as being 41.7 plus 19.50 chains, which would total 61.20 chains, as contrasted with the 80.49 chains recorded for the line on the Greeley survey. It must be noted, however, that on the southerly side of that same line on the Preston plat it is written that the length is 81.61 chains, almost the same as the 80.49 chains ascribed to it on the Greeley survey. While both the Greeley and Preston surveys refer to the easterly terminus of that line as being a post standing on the border of Lake St. Clair, there is no proof to establish that that border remained stationary during the 8 years intervening between the 2 surveys or that the post referred to in one was the same as that in the other or in the same location as that mentioned in the other, or whether the presence of the post or posts antedated one or the other of the 2 surveys or whether each surveyor placed posts for the purpose of his survey.

From testimony and many exhibits, including descriptions contained in conveyances, through many years, of property in Claims 599 and 623 and also in what is above referred to as unconceded lands it

is evident that Harper avenue, once known as French Claim road, has commonly been accepted for many decades as the dividing line on the west between the 2 claims and the unconceded lands. This is not expressly disputed by the State, which apparently accepts that line as the westerly boundary of the 2 claims as located in the Preston survey. The defendants contend, but the State disputes, that it must also be taken to be the westerly boundary as located by the Greeley survey. If the latter be taken as the fact, then the measurements of the lines of Claim 623, running east and west, according to the Greeley survey, place the eastern boundary of that claim east or lakeward of the 2 lots involved in this case. If the Preston measurement written on the north side (as contrasted with that written on the south side) of the north boundary line of Claim 623 on his plat be accepted as correct, then, commencing from Harper avenue, the 2 lots would be lakeward of the easterly line of Claim 623.

Is it true, as the State contends, that the alleged difference in the 2 surveys of some 19 chains in the length of the northerly boundary of Claim 623 is due to Preston's having placed the westerly boundary of Claims 623 and 599 that much further east than Greeley had done, thus shortening the east and west depth of the 2 claims, as patented, and eliminating some 250 acres therefrom and incorporating the same into the unconceded lands area? Did the 2 claims, as surveyed by Greeley and patented to the heirs of James Abbott originally extend some 19 chains westerly of present Harper avenue?

Aside from consideration of whether it would have been legally competent for the Federal government or its surveyor to take away from the Abbott heirs some 250 acres of land patented to them, there is nothing in the record to suggest a determination or intent by either to do so. Neither is there any evi-

dence that the Abbott heirs or their assigns raised
a protest or clamor in 1818 or thereafter because
of being stripped of such property. Is it reasonable
to suppose that they would not have done so if this
actually had occurred?

Other surveys made in 1818 by Fletcher, by Mullett in 1823, and Sibley in 1829, tend to establish
the line of Harper avenue as the westerly boundary
of Claims 623 and 599. They are not determinative
of the State's contention that the line used by Greeley
was some 19 chains westerly therefrom.

On the other hand, in 1843, the heirs of Abbott
decided to divide Claims 599 and 623 between them.
They commissioned A. E. Hathon, a surveyor, to
work out the partition. At that time, 25 years after
the Preston survey for the sale of the unconceded
lands to the public, Hathon laid out Claims 599 and
623 into 7 lots. For his survey he located, at the
northwest corner of Claim 623, a beech tree, as had
Greeley 33 years before. He found the northerly
line from that tree to a post on the border of Lake
St. Clair to be 80 chains in length. Greeley found
it to be 80.49 chains. Hathon divided the 2 claims
into 6 lots which he described as containing 200
acres each, and a 7th lot of 120 acres, for a total
of 1,320. This is 40 acres more than the patents
indicated, but contradicts the idea that 250 acres
had been taken away in 1818 or thereafter as a
result of the Preston survey. There is nothing in the
record to indicate that purchasers of the so-called
unconceded lands immediately to the west of and
adjacent to Harper avenue objected to the Hathon
survey and division of the 2 claims in such fashion
as to contain the 250 acres which the State says
must have lain, under the Greeley survey and patents' descriptions, west of Harper avenue. This
makes the contention that there had been such stripping of acreage by Preston from the 2 claims all

the more dubious. As said in *Matthews* v. *McLouth,*
232 Mich 468, 473:

"The lines as established by this   *   *   *   sur-
vey have not been questioned for over a century
and it seems inconceivable that these lines would
not have been attacked during that time if they had
been incorrect."

We conclude that the line of Harper avenue was,
from and at the time of the Greeley survey and pat-
ents, and ever since has been the westerly line of
Claims 599 and 623.

That the borderline of Lake St. Clair was differ-
ent at the time of the Greeley survey in 1810 from
what it was in January of 1818 when Preston sur-
veyed is altogether possible in view of the history
of variation of lake elevations throughout the years.
It may well be that Preston, in measuring from the
northwest corner of Claim 623 to the waterfront,
stopped at a point considerably west of the place
which Greeley considered to be the boundary of
the lake 8 years earlier, because of a shifting of
location of that boundary due to different lake levels
or elevations. This could account for some 19 chains
difference in the Greeley and Preston measurements
for the northerly line of Claim 623. We are per-
suaded that the lots in question lie landward from the
easterly boundary line of Claim 623 as it existed
at the time it was patented.

In point, then, is what this Court said in *People,
ex rel. Director of Conservation,* v. *Broedell,* 365
Mich 201, 206, 207:

"If lots 36 and 37 were within the confines of
Private Claim 623 as patented to defendant's prede-
cessors in title, the heirs of James Abbott, on June
1, 1811, no title thereto passed from the United
States to the State of Michigan upon its admission
into the Union in 1837, even if submerged land at

the time, because then it no longer belonged to the
United States but to the Abbott heirs or their suc-
cessors in title.   In apparent recognition of this
the legislature, in enacting the cited submerged land
acts, expressly made them applicable only to 'un-
patented' lands.   See *Knight* v. *United States Land
Association,* 142 US 161 ([*Knight* v. *United Land
Association*] 12 S Ct 258, 35 L ed 974.)   See, also,
*Beard* v. *Federy,* 3 Wall (70 US) 478 (18 L ed 88).
If the lots were within the boundaries of the pat-
ented lands, plaintiff's bill should be dismissed and
decree entered for defendant."

It is said, however, that the United States had no
power to grant subaqueous land lakeward from the
borderline of the lake because it held title to it only
in trust to convey it to the State to be formed from
the territory involved.   Language in *Pollard* v. *Ha-
gan,* 3 How (44 US) 212 (11 L ed 565), supported
such view.   As later stated, however, in *Brewer-El-
liott Oil & Gas Co.* v. *United States,* 260 US 77, 83
(43 S Ct 60, 67 L ed 140), that language was not
necessary to the decision in *Pollard* and was subse-
quently qualified in *Goodtitle* v. *Kibbe,* 9 How (50
US) 471 (13 L ed 220).   The *Brewer-Elliott Oil &
Gas Company Case* and *Shively* v. *Bowlby,* 152 US
1 (14 S Ct 548, 38 L ed 331), are cited with approval
in *United States* v. *Holt State Bank,* 270 US 49, 54,
55 (46 S Ct 197, 70 L ed 465), for the holding that:

"It is settled law in this country that lands under-
lying navigable waters within a State belong to the
State in its sovereign capacity and may be used
and disposed of as it may elect, subject to paramount
power of congress to control such waters for the
purposes of navigation in commerce among the
States and with foreign nations, and subject to the
qualification that where the United States, after ac-
quiring the territory and before the creation of the
State, has granted rights in such lands by way of

performing international obligations, or effecting the use or improvement of the lands for the purposes of commerce among the States and with foreign nations, or carrying out other public purposes appropriate to the objects for which the territory was held, such rights are not cut off by the subsequent creation of the State, but remain unimpaired, and the rights which otherwise would pass to the State in virtue of its admission into the Union are restricted or qualified accordingly."

Here are lands once under the domain of France, acquired by England by the Treaty of Paris in 1763, which continued under English occupation until acquired by the United States under the Jay Treaty in 1794. In 1804 congress passed an act for recognition of land claims in the territory.[1] Commissioners were sent to Detroit to locate the claims of parties who wanted to establish a title to lands. Claims under that act and an act of 1806[2] could be founded, *inter alia,* on possession prior to 1796. Claims of James A. Abbott, Esq., Nos 599 and 623, were based on such possession and occupancy. It cannot be said that grants, if made to extend out into the lake beds, were not intended to carry out a public purpose appropriate to the objects for which the territory was acquired and held, particularly, with respect to settlers who were occupants in possession from antiquity, some of those thus sought to be protected by congress in the acts of 1804 and 1806 possibly having claims antedating acquisition of the territory by international treaty with England in 1794. It was within the power of the United States to so convey the property included in the 2 claims.

---

[1] 2 Stat, p 277, ch 35.—REPORTER.
[2] 2 Stat, p 395, ch 40.—REPORTER.

Be that as it may, however, having concluded that the westerly boundary of the private claims was the present location of Harper avenue, and the north and south boundaries having been fixed for a definite distance lakeward therefrom to posts described as being on the border of the lake, it follows that what the patents covered then was upland lying landward of the border of the lake. There is no necessity, then, for determination, here, of whether the United States had the power to grant the land, or for pondering the principle, as stated in *McIvers' Lessee* v. *Walker,* 4 Wheat (17 US) 444, 447 (4 L ed 611), "that the course and distance must yield to natural objects called for in the patent" inasmuch as the relevant posts and beech tree cannot be found and the location of the border of the lake in 1811 is not established by the proofs, except as it is fixed by the measurement from Harper avenue easterly as stated in the patent. There are, then, no natural objects existing when the patent was given which now are discoverable to which the "course and distance must yield." In this connection we are indebted to the State for the statement in its brief, undoubtedly correct, that:

"As a practical matter there was no necessity of making any conveyances of submerged lands insofar as the private claimants are concerned. The private claimants in the Macomb County area were making their claims based upon occupancy and cultivation. There was no need to occupy or cultivate submerged land for such purpose would have served no particular value. What these people were interested in was access to the water and to the highways which these waters afforded them."

This leaves no need for consideration of the question of the power of the United States to convey lake bottom land held in trust. The land was granted to the Abbotts to the full extent of the description

contained in the patent. Their rights to the land, whether above or beneath water, were not cut off by the subsequent creation of the State. *United States* v. *Holt State Bank, supra.*

In the *Holt State Bank Case* it is stated that the policy of the United States, with respect to lands under navigable waters in acquired territory, was to regard them as held for the ultimate benefit of future States, and that (p 55):

"It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain."

Here the exact measurements from a fixed point, as contained in the description in the patents, made the intention definite and plain. Consequently, even if a portion of the claims as described in the patent then had been under water, it must be held that the intention to convey even the allegedly subaqueous portion, if any, was clear. We incline, however, to the view, absent any proofs as to water levels and location of the lake border at the time, that, for the reasons above expressed, the lake front then bordered the private claims at a place which was easterly from French Claim road (now Harper avenue) the precise number of chains and links and on the course mentioned in the patent descriptions of Private Claims 599 and 623.

We are referred to *Hilt* v. *Weber,* 252 Mich 198 (71 ALR 1238). In that case the issue was not the ownership of submerged lands but, rather, dry lands between the meander line and the water's edge. Stressed here is the statement therein (p 219) that it is the general rule, with some exceptions, "that the title of the riparian owner follows the shoreline

under what has been graphically called 'a moveable freehold'." Nowhere in the opinion in the *Hilt Case* nor in the records and briefs filed therein in this Court, is it suggested that title to the lands involved traced to an original Private Claim under a United States patent as is the situation in the instant case. Neither does it appear that there was there involved a title to lands under a description starting at a fixed point or line landward and extending for a definite distance therefrom lakeward as in the case at bar. Title to submerged land was not in issue in *Hilt* as this Court expressly stated (p 203) in its opinion in that case. Decision in the case was not, therefore, controlling of the situation now before us. Here the United States conveyed a private claim of specific dimensions at a definite location. Determination of that location, as we have done above, is conclusive of the occupant's rights today. They continue to own, through chain of title, what was granted to the patentees in the first place.

The question is raised whether the patentees and those claiming under them have lost from the then dry lands originally patented to them title to so much of the private claims as, subsequent to the date of patent, may have become inundated by rising lake levels or through the processes of avulsion or erosion. That the answer should be held to be in the negative is supported by *Mulry* v. *Norton,* 100 NY 424 (3 NE 581, 53 Am Rep 206), *In re City of New York (Appeal of Realty Associates),* 256 NY 217 (176 NE 171), *In re City of New York (Appeal of West Tenth Street Realty Corporation),* 256 NY 222 (176 NE 173), and *City of Chicago* v. *Ward,* 169 Ill 392 (48 NE 927, 38 LRA 849, 61 Am St Rep 185). The owner's continuing title and ownership, after the lands become submerged and, thereafter, when their restoration to dry condition results either from natural forces or

even by artificial, man-made means, is indicated by those cases. We hold to that same effect. In so doing, we quote with approval from the opinion of the trial court in the instant case, the following:

"The Ordinance of 1787 for the Northwest Territory provided in part as follows:

" 'The legislatures of those districts or new States shall never interfere with the primary disposal of the soil by the United States in congress assembled, nor with any regulations congress may find necessary for securing the title in such soil to the bona fide purchasers.'

"The act providing for the admission of Michigan into the United States as a State (1836)[3] contains a similar provision. The language of the patent conveys fee simple title to the heirs of James Abbott, deceased. The Michigan State legislature seems to have recognized a distinction between patented and unpatented lands on several occasions. PA 1899, No 175[4] provided for the sale, disposition and control of unpatented swamp and overflowed lands in Clay township, St. Clair county. PA 1909, No 215 provided for the sale, disposition and control of unpatented swamp lands, overflowed lands, lake bottom, made lands, and all other unpatented lands in the said Clay township. PA 1913, No 326 [as amended (CL 1948 and CLS 1961, § 322.401 et seq. [Stat Ann 1958 Rev and Stat Ann 1963 Cum Supp § 13.701 et seq.])] provides for the lease, control, taxation and conveyance of unpatented overflowed lands, made lands and lake bottom lands belonging to the State of Michigan. As heretofore observed the Great Lakes submerged lands act [supra] applies only to unpatented submerged lake bottom lands and unpatented made lands in the Great Lakes belonging to the State of Michigan or held in trust by it. It appears to this court that this recog-

[3] 5 Stat, p 49, ch 99.—REPORTER.
[4] Repealed, and superseded. See CL 1948, § 322.429 note.—REPORTER.

nized distinction has as its objective the means by which riparian owners next adjacent to unpatented made lands and unpatented submerged lands may acquire title thereto. It appears reasonable to this court that it permits the owners of such unpatented lands to acquire that which the owners of patented lands had acquired by conveyance from the United States prior to Michigan's admission into the Union as a State. It appears reasonable to this court that the exclusion of patented lands from the various statutes indicates legislative recognition that the State of Michigan has no trust interest in lands conveyed by the United States by patent to purchasers before the State could acquire such trust interest by admission into the Union. If the State of Michigan did acquire trust interest in the premises when they became submerged by natural erosive or avulsive action, the statute would then have to be construed as if the word 'unpatented' were absent therefrom because it would then apply to all 'made lands' and all 'lake bottom lands' in the Great Lakes including its harbors and bays."

Defendants cite *Randolph* v. *Hinck,* 277 Ill 11 (115 NE 182, *Baumhart* v. *McClure,* 21 Ohio App 491 (153 NE 211), and *Fowler* v. *Wood,* 73 Kan 511 (85 P 763, 6 LRA NS 162), for the principle that one may defend his land against the sea and retrieve it after inundation. It appears that those cases are helpful to that position particularly in situations of inundation due to avulsion as contrasted with erosion. As we said in *Broedell* (p 204), so here, "The proofs show a high degree of fluctuation in the water levels of the lake throughout the years and the seasons and months within those years." The record of lake levels goes back to 1860. It discloses that at times, as recently as after 1926, there was inundation at different times resulting from avulsion. In our view, however, whether inundation be due to the one cause or the other, property owners tracing title back to

a United States patent may reclaim the full extent
of the description therein, which they continued to
own all the while, when again above water, whether
the emergence of the land be due to natural forces or
artificial means. Inasmuch as the patent descriptions
extended to posts on the border of the lake, mani-
festly it was intended that riparian rights should
be and they were included. *Mitchell* v. *Smale,* 140
US 406 (11 S Ct 819, 35 L ed 442) ; *United States* v.
*Lane,* 260 US 662 (43 S Ct 236, 67 L ed 448). As
said in *Hilt* v. *Weber, supra,* 218, 225, and we quote
it with approval, "the upland owner has riparian
rights  *  *  *  interposition of a fee title between
upland and water destroys riparian rights.  *  *  *
The basis of the riparian doctrine, and an indispens-
ible requisite to it, is actual contact of the land with
the water.  *  *  *  The right to acquisitions to land,
through accession or reliction, is itself one of the
riparian rights.  *  *  *  Riparian rights are prop-
erty, for the taking or destruction of which by the
State compensation must be made." Application of
the rules, then, to accretions, relictions, avulsions or
erosions on the Great Lakes amounts to this, that
owners of lands, bordering on the navigable waters
thereof, patented to their ancestors in title by the
United States, gain by what comes through accre-
tions or reliction but do not lose by erosion or avul-
sion that which they own under the patent. When,
during a period of high water level and inundation
of lands of the private claim, conveyance is made of
all or some portion thereof by description stating
that it extends to the lake, it must be held to mean,
unless a contrary intent is clearly expressed, that
it extends at least to the border of the lake as of the
date of the patent, and, by reason of riparian rights
and the consequent right to accretions, beyond if,
and when accretions or reliction cause the border of
the lake to recede further lakeward.

Procedurally, this case is unusual in that its trial has produced 2 appeals. The original decree, holding adversely to the State as intervening plaintiff, granted plaintiffs specific performance of the land contract, as prayed, upon payment to defendants of the $700 balance due thereon, but denied plaintiffs any other relief sought against defendants on the theory that defendants had and could convey good and marketable title as against the State and need not, therefore, pay anything to the State or reimburse plaintiffs for what they had paid to the State for conveyance of the State's interest in the lots. The State appealed and it is that appeal which is disposed of by this opinion. After the taking of this appeal the circuit court amended the decree, still holding adversely to the claim of the State, but requiring defendants to reimburse plaintiffs in the amount paid by them to the State for its conveyance, less the $700 still owed by them on the contract, and providing for defendants' being subrogated to plaintiffs' rights to recover such payment from the State. This was on the theory that while the court was holding that the State's claim was invalid, it nevertheless had constituted a cloud on defendants' title, leaving it not marketable as required by the contract and that, hence, defendants were obligated to procure removal of that cloud. After entering of that amended decree, defendants appealed here. The latter has been treated as a separate appeal, with questions in addition to those raised herein, to be disposed of in a separate opinion.[5] For the purposes of disposing of the State's appeal considered in this opinion, the original decree, in the respect that it holds adversely to the State's position and claim, is affirmed, with costs to

---

be paid by the State to defendants only, plaintiffs having filed no brief herein.

KAVANAGH, C. J., and KELLY, BLACK, SOURIS, SMITH and O'HARA, JJ., concurred.

ADAMS, J., did not sit.