683 N.W.2d 719 (2004)
262 Mich.App. 29
Joan M. GLASS, Plaintiff-Appellee,
v.
Richard A. GOECKEL and Kathleen D. Goeckel, Defendants-Appellants.
Docket No. 242641.
Court of Appeals of Michigan.
Submitted January 15, 2004, at Lansing.
Decided May 13, 2004, at 9:00 a.m.
Released for Publication July 21, 2004.
*720 Weiner & Burt, P.C. (by Pamela S. Burt), Harrisville, for the plaintiff.
Braun Kendrick Finkbeiner P.L.C. (by Scott C. Strattard and Jamie Hecht Nisidis), Saginaw, for the defendants.
Smith, Martin, Powers & Knier, P.C. (by David L. Powers), Bay City, for Save Our Shorelines, Inc., Amicus Curiae.
Before: O'CONNELL, P.J., and WILDER and MURRAY, JJ.
MURRAY, J.

I. Introduction
Plaintiff, a neighbor of defendants, asserts that as a member of the general public she "has the right to navigate and walk across those portions of the shore and waters of Lake Huron lying below and lakeward of the natural ordinary high-water mark, free from obstruction or interference by defendants." Defendants argue that their property rights extend to the waters' edge, and that plaintiff could not walk beyond the waters' edge and onto their property. The trial court held that plaintiff was entitled to freely traverse the "shore of Lake Huron lying below and *721 lakewards of the natural ordinary high water mark as specifically defined in MCL 324.32502." We conclude otherwise, and therefore reverse the trial court's order granting plaintiff's motion for summary disposition and remand for entry of an order granting defendants' motion for summary disposition.

II. Material Facts and Proceedings
Since 1997, defendants have owned property east of US-23 in Alcona County that abuts Lake Huron. Plaintiff has, since 1967, owned property in Alcona County west of US-23 and, essentially, on the other side of US-23 from defendants' property. In the deed to her property, plaintiff was granted a fifteen-foot easement across defendants' property "for ingress and egress to Lake Huron."
According to plaintiff's first amended complaint, a dispute between plaintiff and defendants arose in August 2000, when plaintiff trimmed several tree branches that were impeding her use of the easement. In spring 2001, the dispute continued with defendants[1] objecting to any pruning of trees or bushes. According to plaintiff, defendants obstructed the entrance to the easement by parking Mr. Goeckel's vehicle at the entrance. Additionally, plaintiff claimed that defendants threatened or did interfere with her right to walk across the beach area, between the ordinary high-water mark and Lake Huron, in front of defendants' property. As a result, plaintiff filed a three-count first amended complaint, asking the trial court to enjoin defendants from interfering with her rights to the express easement and the usage of the shoreline.
The parties eventually resolved the issues pertaining to the express easement, resulting in plaintiff's being able to utilize the easement for ingress and egress to Lake Huron, to use the beach portion of the easement for sunbathing and lounging, and to do certain pruning to ensure that the easement remains unimpeded in at least a ten-foot-wide area.
Regarding the remaining issue, defendants moved for summary disposition pursuant to MCR 2.116(C)(8) and (9), arguing that, as a matter of law, plaintiff was not entitled, over defendants' objections, to walk across the beach fronting defendants' property between the high-water mark and the lake. Plaintiff filed a response seeking summary disposition in favor of her right to engage in such activity. The trial court, stating that "there is no clear precedent here," granted summary disposition in favor of plaintiff on the following basis:
However, it appears to this Court that Plaintiff has the better argument and the Court therefore rules in Plaintiff's favor. The Great [L]akes Submerged Land Act, MCL § 324.32501 et seq [.], does provide for a specific definition of the high water mark of Lake Huron and does seem to support the argument that the Plaintiff's [sic] have the right to use the shore of Lake Huron lying below and lakewards of the natural ordinary high water mark for pedestrian travel.

III. Analysis

A. Standard of Review
Although the trial court did not indicate under which court rule it granted summary disposition, plaintiff moved for summary disposition pursuant to MCR 2.116(C)(10). Therefore, we will consider the trial court's ruling as if it were granted under that subrule. We review a decision *722 granting summary disposition de novo, Psaila v. Shiloh Industries, Inc., 258 Mich.App. 388, 391, 671 N.W.2d 563 (2003), applying the same standard under MCR 2.116(C)(10) that the trial court was required to utilize:
Summary disposition may be granted pursuant to MCR 2.116(C)(10) when, except with regard to the amount of damages, there is no genuine issue about any material fact. When deciding a motion for summary disposition pursuant to MCR 2.116(C)(10), a court must consider all pleadings, affidavits, depositions, and other documentary evidence in the light most favorable to the nonmoving party. Ritchie-Gamester v. Berkley, 461 Mich. 73, 76, 597 N.W.2d 517 (1999). The nonmoving party has the burden of rebutting the motion by showing, through evidentiary materials, that a genuine issue of disputed fact does exist. Smith v. Globe Life Ins. Co., 460 Mich. 446, 455, 597 N.W.2d 28 (1999). [Old Kent Bank v. Kal Kustom Enterprises, 255 Mich.App. 524, 528-529, 660 N.W.2d 384 (2003).]
Additionally, "[t]he trial court properly grants summary disposition to the opposing party under MCR 2.116(I)(2) if the court determines that the opposing party, rather than the moving party, is entitled to judgment as a matter of law." Washburn v. Michailoff, 240 Mich.App. 669, 672, 613 N.W.2d 405 (2000).

B. Riparian Rights and the Public Trust Doctrine
Defendants claim that, as owners of property abutting Lake Huron, they have the exclusive right to use the land up to the waters' edge, and that they can therefore preclude plaintiff from traversing anywhere on their property above the waters' edge. In support of this position, defendants principally rely on Hilt v. Weber, 252 Mich. 198, 233 N.W. 159 (1930). Hilt, which we will review in detail later in this opinion, contains a thorough discussion of the rights of riparian owners along our Great Lakes. However, in order to properly understand the context in which Hilt was decided, we must first review the so-called "Kavanaugh cases," Kavanaugh v. Rabior, 222 Mich. 68, 192 N.W. 623 (1923), and Kavanaugh v. Baird, 241 Mich. 240, 217 N.W. 2 (1928), which were both overruled in Hilt.
In Rabior, supra, the plaintiff was the owner of Saginaw Bay waterfront property. The defendant built a summer cottage on a 280-foot-wide strip of land between the plaintiff's lots and the shoreline, which the plaintiff claimed ownership to because the strip of land was created through accretions.[2] The Supreme Court held that the strip of land, which was located between the meander line[3] and the water line, was "in the law, submerged land and lake bottom." Id. at 69, 192 N.W. 623. *723 This conclusion was compelled because, according to the Court, the strip of land had been submerged when the meander line was drawn, the strip of land only appeared because of a gradual recession of the water, and, therefore, the land should continue to be regarded in the law as lake bottom:
We think a fair inference is, from the meager testimony, that the disputed strip was submerged when the meander line was established, and that the disputed strip is the result of the recession of the waters and not of accretions. If this be true, the disputed area must be regarded in the law as lake bottom. When the meander line was established it fixed the status of the disputed strip as lake bottom, and this status in the law would not change even though a portion of it had become dry land. [Id. at 70-71, 192 N.W. 623.]
This conclusion was based on the Court's view that "`riparian owners along the Great Lakes own only to the meander line, and that title, outside this meander line, subject to the rights of navigation, is held in trust by the State for the use of its citizens.'" Id. at 71, 192 N.W. 623, quoting Ainsworth v. Munoskong Hunting & Fishing Club, 159 Mich. 61, 64, 123 N.W. 802 (1909). Thus, because the plaintiff did not have title to the strip of land that resulted from the water receding, he was not entitled to eject the defendant from the strip of land.
Five years later, the Court decided another case regarding the same property, but involving partially different parties. In Baird, supra, the plaintiff brought suit against the defendant, the state director of conservation, seeking to quiet title to the same strip of land. Much as he did in the prior case, the plaintiff argued that he held title to the land by means of accretion and reliction. The defendant, on the other hand, asserted title in the name of the state, which held title to the land in trust for the benefit of the people.
The trial court ruled in favor of the defendant. In affirming the trial court, the Court took judicial notice that the land was created by both accretion and reliction, but most potently through reliction, for " Saginaw Bay is very shallow at the shores, and but slight recession of the water uncovers a large area." Baird, supra at 242, 217 N.W. 2. Relying on its holding in Rabior, the Court held that the land had previously been submerged land and, therefore, the relicted land (which had grown in size since Rabior was decided) was held by the state in trust for the people:
If the title to the lake bottom passed to the state in trust upon its admission to the Union, and that title did not shift and change with the shifting and changes in conditions, and we so held in that case, then the title to the property here in question is in the State in trust, and is not in the plaintiff, and to sustain the plaintiff's contention necessitates the overruling of the Rabior Case and the cases which have preceded it. [Id. at 243, 217 N.W. 2.]
Although the Court recognized that it would have to reverse Rabior in order to hold that the plaintiff owned the land to the waters' edge, it refused to do so even while conceding that its decisions in Rabior and Baird were "against the overwhelming weight of authority...." Id. at 252, 217 N.W. 2. Thus, the Court held that all land that was Great Lakes bottomland at the time the state entered the Union, but which was now dry because of accretion or reliction, was held by the state and not the riparian owner:
Changes in condition from year to year do not change the title or rights of the State. They are fixed as of the date of the admission of the State into the *724 Union. So, likewise, are the rights of the riparian owner. When the State was admitted into the Union the lands here bordering on Saginaw Bay were owned by the Federal government. It held them as proprietor and when it sold, the right of a riparian owner as of that date passed to its grantee. [Id. at 253, 217 N.W. 2.]
As noted, Hilt expressly overruled the Kavanaugh cases. Hilt, supra at 227, 233 N.W. 159. Hilt involved a land contract foreclosure. The property at issue, which the defendants had purchased from the plaintiffs, abutted Lake Michigan. The meander line was about 277 feet from the waters' edge, and the plaintiffs' real estate agent had placed a stake in the ground one hundred feet from the water, informing the defendants (at that point prospective purchasers) that the stake represented the boundary of the plaintiffs' property. The defendants prevailed in the trial court and were awarded damages for the plaintiffs' failure to pass title to the 177 feet of land between the stake and the meander line, which under the Kavanaugh cases was land held in trust by the state subject to riparian rights of the upland owner. Id. at 201, 233 N.W. 159. The issue on appeal concerned the damages recovered by the defendants, which required the Court to examine "the respective rights of the State and the riparian owner in the strip of relicted land." Id.[4] In doing so, the Court had to reexamine the Kavanaugh cases, because they specifically dealt with the respective rights between the state and riparian owners to relicted land.[5]
The Hilt Court first addressed the proposition from the Kavanaugh cases that the meander line was drawn at the waters' edge and was to be considered a boundary line. The Court flatly rejected such a conclusion, instead holding that, at least until the Kavanaugh cases, precedent had uniformly established that the meander line was not a boundary, nor was it run at the waters' edge:
It is well know that, in innumerable instances, as in that at bar, the meander line was not run at the water's edge in fact. It is also established that it is not a boundary in law. In Railroad Co [v. Schurmeir, 74 U.S. (7 Wall) 272, 19 L.Ed. 74 (1868)], it was pointed out that, by the act of congress providing for the survey, while the straight lines were given the force of boundaries, no mention was made of meander lines in the act; that they were a device of the surveyor for the purpose of reporting the contents of the subdivision and to enable the surveyor general to make a plat required by law. They were run as merely general, not accurate, representations of the shore. Blodgett & Davis Lbr. Co. v. Peters, 87 Mich. 498 [49 N.W. 917] (24 Am. St. Rep. 175) [(1891)]; United States v. Lane, 260 U.S. 662 (43 S.Ct. 236) [67 L.Ed. 448 (1923)]. [Hilt, supra at 204, 233 N.W. 159.]
See, also, id., at 212, 233 N.W. 159 (The meander line "was not meant to be strictly accurate in depicting the precise sinuosities of the shore. The boundary was where nature had placed it  at the water's edge.").
Having rejected this first proposition underlying the holdings in the Kavanaugh cases, the Court turned to "the second proposition of the Kavanaugh Cases, that *725 the status of land as lake bottom, fixed when the meander line was run, did not change in law even though a portion of it afterward became dry land." Id. at 213, 233 N.W. 159. In rejecting the holding that previously submerged dry land remained submerged land under the law, the Court examined the two cases relied on by the Baird Court: Sterling v. Jackson, 69 Mich. 488, 37 N.W. 845 (1888), and State v. Venice of America Land Co., 160 Mich. 680, 125 N.W. 770 (1910). The Hilt Court concluded that neither Sterling nor Venice of America supported the holdings in the Kavanaugh cases, Hilt, supra at 216, 233 N.W. 159, and instead held that title to private lakefront[6] land follows the shore, even when the shoreline changes over the years:
On the contrary, this court often had declared the effect of a meander line upon the Great Lakes in harmony with authority elsewhere, and, at least inferentially, had recognized that title would follow the shore in case of change of condition under private ownership, in accordance with the common law. [Id. at 216-217, 233 N.W. 159.]
Indeed, throughout its opinion, the Court noted how the Kavanaugh cases had "put the Great Lakes in a legal straightjacket" by deviating from prior Michigan law and common law, which held that riparian owners hold title to the land up to the waters' edge:
Prior to the Kavanaugh Cases there appears to have been little or no conflict of law upon the effect of reliction on title. The law of the sea applies to the Great Lakes. Hardin v. Jordan [140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891)]. All maritime nations, recognizing the vagaries of the sea, beyond human control and anticipation, have evolved systems of law, founded upon rational conceptions of common justice, to adjust and compensate its effects. The most ordinary effect of a large body of water is to change the shore line by deposits or erosion gradually and imperceptibly. In such cases it is the general, possibly universal, rule, except for the Kavanaugh Cases, and except in a few States where riparian rights have been extinguished by Constitution or statute, that the title of the riparian owner follows the shore line under what has been graphically called "a movable freehold." 28 Halsbury, Laws of England, 361. [Id. at 219, 233 N.W. 159 (emphasis added).]
As support for its holding, the Hilt Court relied on many state and federal decisions. See id. at 220, 233 N.W. 159. In particular, the following passage from Shively v. Bowlby, 152 U.S. 1, 35, 14 S.Ct. 548, 38 L.Ed. 331 (1894), clarified both the distinction between the title to submerged lands held by the states and the riparian right to land as the water recedes and rises over the years:
"The rule, everywhere admitted, that where the land encroaches upon the water by gradual and imperceptible degrees, the accretion or alluvion belongs to the owner of the land, is equally applicable to lands bounding on tide waters or on fresh waters, and to the King, or the State as to private persons; and is independent of the law governing the title in the soil covered by the water." Page 35.
"The reason ordinarily given for the rule is that it is necessary to preserve the riparian owner's right of access. Other reasons sometimes are that it is within the maxim, de minimis non curat lex, or that since the riparian owner *726 may lose soil by the action of the water he should have the benefit of any land gained by the same action." 45 C.J. p. 525. [Hilt, supra at 219-220, 233 N.W. 159 (emphasis modified in part).]
Hence, under Hilt, a riparian owner has the exclusive right to the use of relicted land subject to only the state's navigational servitude, and therefore "it has been held that the public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner...." Id. at 226, 233 N.W. 159.[7] Although the riparian owner has the exclusive right to utilize such land while it remains dry, because it once again may become submerged, title remains with the state pursuant to the public trust doctrine. Id. This is so because a riparian owner cannot interfere with the public's right to the free and unobstructed use of navigable waters for navigation purposes. Id.
As the foregoing demonstrates, the Hilt Court placed Michigan riparian law, as it pertains to navigable waters, back in conformity with the common law as it existed in Michigan before the Kavanaugh cases. Courts since then have recognized that under Hilt, a riparian owner has exclusive use of the dry land to the waters' edge and loses the exclusive right to use that same dry land when it becomes submerged by the rising waters. See, e.g., Peterman v. Dep't of Natural Resources, 446 Mich. 177, 192-193, 521 N.W.2d 499 (1994) (quoting Hilt, the Supreme Court stated that it "has long held" that "`the right to acquisitions to land, through accession or reliction, is itself one of the riparian rights.' Hilt, supra at 218, 233 N.W. 159. Hence, the `title of the riparian owner follows the shore line under what has been graphically called "a moveable freehold."'"); Bott v. Natural Resources Comm., 415 Mich. 45, 82, 327 N.W.2d 838 (1982) ("In Hilt, a recent holding in the Kavanaugh Cases that owners adjacent to the Great Lakes hold title to land running along the meander line but not to the waters' edge was re-examined and overruled."); Klais v. Danowski, 373 Mich. 262, 279, 129 N.W.2d 414 (1964) (recognizing under Hilt that a riparian owner has use of the land to the waters' edge, including any new land occurring through accretions or reliction); Donohue v. Russell, 264 Mich. 217, 218, 249 N.W. 830 (1933) (recognizing that Hilt"held that the riparian owner owns the land beyond the meander line to the edge of the water."); Boekeloo v. Kuschinski, 117 Mich.App. 619, 626-627, 324 N.W.2d 104 (1982); Turner Subdivision Prop. Owners Ass'n v. Schneider, 4 Mich.App. 388, 391, 144 N.W.2d 848 (1966) ("Hilt established that a riparian owner owns land between the meander line and the water."); Nordale v. Waxberg, 84 F.Supp. 1004, 1006 (D.Alaska 1949) (recognizing that in Hilt"it was held that the boundary line of riparian owners along the Great Lakes is the waters' edge, and not the meander line. The riparian owner has the right to accretion.").
The Hilt conclusion that a riparian owner has the right to the exclusive use of relicted land is entirely consistent with the title held by the state under the public trust doctrine. This doctrine, which places lands submerged beneath the Great Lakes and those waters themselves in trust with the state, was explained by the United States Supreme Court in Illinois Central R Co. v. Illinois, 146 U.S. 387, 452, 13 S.Ct. 110, 36 L.Ed. 1018 (1892):

*727 That the State holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the State holds title to soils under tide water, by the common law, we have already shown, and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use. But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. [Emphasis added.]
That the state of Michigan holds in trust the submerged lands beneath the Great Lakes within its borders for the free and uninterrupted navigation of the public is without doubt. See Peterman, supra at 194, 521 N.W.2d 499; Nedtweg v. Wallace, 237 Mich. 14, 16-17, 208 N.W. 51 (1926); People v. Massey, 137 Mich.App. 480, 485, 358 N.W.2d 615 (1984). Importantly, the public trust doctrine "is not limited to water sufficiently deep to float craft, but extends to the point where it joins the ground of the riparian owner, `whether the water be deep or shallow, and although it be grown up to aquatic plants and unfit for navigation.'" State v. Lake St. Clair Fishing & Shooting Club, 127 Mich. 580, 586, 87 N.W. 117 (1901) (Hooker, J., concurring), quoting People v. Warner, 116 Mich. 228, 239, 74 N.W. 705 (1898).
The law of riparian rights and the public trust doctrine therefore go hand in hand. As the Peterman Court accurately described the two principles:
The State of Michigan holds in trust the navigable waters of the state in behalf of its citizens, and riparian owners hold "the right to use and enjoy" their riparian property "subject to the public right of navigation...." Hall v. Alford, 114 Mich. 165, 167, 72 N.W. 137 (1897). [Peterman, supra at 194, 521 N.W.2d 499.]
The dividing line between the two is the waters' edge. Warner, supra. After all, an indispensable requisite to the riparian doctrine is actual contact of the land with the water. Klais, supra at 279, 129 N.W.2d 414; Turner Subdivision, supra at 391, 144 N.W.2d 848. It is therefore clear that, in this case, defendants' riparian rights provided them with the exclusive use of the relicted land and beach in front of their land up to the edge of Lake Huron. Hilt, supra. Although the state holds title to land previously submerged, the state's title is subject to the riparian owner's exclusive use, except as it pertains to navigational issues. Id.; Peterman, supra at 195, 521 N.W.2d 499. However, if and when the Great Lakes rise, the riparian owner no longer has exclusive use to that submerged land, for the state's title in public trust for navigational purposes becomes paramount. Id. Accordingly, because defendants have the right to the exclusive use and enjoyment of their land to the waters' edge, we hold that they may properly prohibit plaintiff from traversing beyond the waters' edge while adjacent to defendants' property. Hilt, supra.

C. Great Lakes Submerged Land
Plaintiff argues that, despite the foregoing case law, MCL 324.32502 provides her with a statutory right to traverse defendants' property anywhere between the ordinary high-water mark and the lake. The trial court, in fact, so held. That statutory provision,[8] which sets forth how the entire *728 part 325 is to be construed, establishes the ordinary high-water mark for Lake Huron at 579.8 feet above sea level. The remainder of the statute provides as follows:
The lands covered and affected by this part are all of the unpatented lake bottomlands and unpatented made lands in the Great Lakes, including the bays and harbors of the Great Lakes, belonging to the state or held in trust by it, including those lands that have been artificially filled in. The waters covered and affected by this part are all of the waters of the Great Lakes within the boundaries of the state. This part shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition. The word "land" or "lands" as used in this part refers to the aforesaid described unpatented lake bottomlands and unpatented made lands and patented lands in the Great Lakes and the bays and harbors of the Great Lakes lying below and lakeward of the natural ordinary high-water mark, but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction. [Emphasis added.]
Applying as we must the unambiguous language of this statute, Northville Charter Twp. v. Northville Pub. Schools, 469 Mich. 285, 290, 666 N.W.2d 213 (2003), it is clear that this section merely sets forth the rules for construing the different sections within part 325, and that it provides no substantive rights. Moreover, even if the statute did set forth substantive rights, it would not afford plaintiff relief. The statute addresses six particular matters: (1) it identifies the lands that are covered and affected by the part; (2) it instructs that the part shall be construed to preserve and protect the public's interest in the lands and waters described in the section; (3) it provides for the state's ability to sell, lease, or exchange unpatented submerged lands; (4) it provides for the private or public use of waters over patented and unpatented lands; (5) it permits the filling in of submerged lands whenever the appropriate state department determines it will not substantially affect the public's right to use such lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or impair the public trust in the state; and (6) it declares that the entire part "does not affect property rights ... acquired by accretions occurring through natural means or reliction." Thus, MCL 324.32502 contains no provision guaranteeing any member of the public the right to walk on a beach fronting private property along one of the Great Lakes. Moreover, it specifically preserves those riparian rights set forth in Hilt and its progeny. Therefore, the trial court erred in holding that MCL 324.32502 grants plaintiff the right to walk on defendants' beach over defendants' objection.
*729 Finally, we reject plaintiff's argument that upholding defendants' riparian property rights will preclude residents or visitors to our Great Lakes and connecting waterways from enjoying the vast beaches bordering our state. Our Supreme Court has repeatedly noted that the state has several means available to it in order to preserve Great Lakes beaches for public use without interfering with a riparian owner's property rights:
It is pointed out that public control of the lake shores is necessary to insure opportunity for pleasure and health of the citizens in vacation time, to work out the definite program to attract tourists begun by the State and promising financial gain to its residents, and to conserve natural advantages for coming generations. The movement is most laudable and its benefits most desirable. The State should provide proper parks and playgrounds and camping sites and other instrumentalities for its citizens to enjoy the benefits of nature. But to do this, the State has authority to acquire land by gift, negotiation, or, if necessary, condemnation. [Hilt, supra at 224, 233 N.W. 159.]
Accord Peterman, supra at 193, 521 N.W.2d 499; Bott, supra at 83-84, 327 N.W.2d 838.

IV. Conclusion
As riparian owners, defendants have the exclusive right to the use and enjoyment of the land that, once submerged, has now become exposed by receding waters. Plaintiff has neither a statutory nor a common-law right to interfere with that use. However, as a member of the public, plaintiff is entitled to utilize the lake bottom until it first reaches dry land, for purposes of navigating the Lake Huron shoreline. The trial court's ruling, to the extent it allowed plaintiff to traverse between the statutory ordinary high-water mark and the waters' edge, is therefore reversed.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] In her first amended complaint, plaintiff only asserts that Mr. Goeckel attempted to interfere with her easement and statutory rights. However, because both Mr. and Mrs. Goeckel are defendants, we will refer to them collectively.
[2] The terms "accretion" and "reliction" are used frequently in the cases discussed in this opinion. "Accretion" is defined as the "gradual accumulation of land by natural forces, esp. as alluvium is added to land situated on the bank of a river or on the seashore." Black's Law Dictionary (7th ed.), p. 21. "Reliction" is defined as the "alteration of a boundary line because of the gradual removal of land by a river or stream." Black's, supra, p. 1293. These terms are not particularly useful in this case, however, because we are here dealing with land resulting from receding waters, which is defined, but not always referred to, as "dereliction." Black's, supra, p. 454.
[3] Meander lines were established by surveyors to determine acreage and values of property, not to create a strict boundary. Whitaker v. McBride, 197 U.S. 510, 512, 25 S.Ct. 530, 49 L.Ed. 857 (1905). The meander line for the Great Lakes was originally established by government survey in 1851, Boekeloo v. Kuschinski, 117 Mich.App. 619, 630, 324 N.W.2d 104 (1982), fourteen years after our state entered the Union in 1837.
[4] The Court noted that some of the land at issue had been upland since the state entered into the Union, but that the remainder became dry by accretion and reliction. Id.
[5] The Court emphasized that its opinion addressed only dry land "extending meandered upland by gradual and imperceptible accession or recession of the water, on the lake side of the meander line," as opposed to submerged lands. Id. at 203, 233 N.W. 159.
[6] The rules of riparian rights and the public trust doctrine set forth in Hilt and its progeny apply to only the shoreline of the Great Lakes and their connecting navigable waterways. Bott v. Natural Resources Comm., 415 Mich. 45, 71, 327 N.W.2d 838 (1982).
[7] This principle in Hilt is dicta, because the dispute in that case did not involve the public's right to access relicted land. However, the principle was endorsed by the Hilt Court, and it is consistent with and germane to the actual holding in Hilt, i.e., that the riparian owner has exclusive use to the land running to the waters' edge. People v. Schaub, 254 Mich.App. 110, 117 n. 2, 656 N.W.2d 824 (2002).
[8] MCL 324.32502 is a section within part 325 of the Natural Resources and Environmental Protection Act, MCL 324.101 et seq. Part 325 was added by 1994 PA 451, and the predecessor to the part, the Great Lakes Submerged Lands Act, MCL 322.701 et seq., was repealed by 1995 PA 59.